IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FRIENDS OF THE EARTH, INC.;
GREENPEACE, INC.; CITY OF BOULDER,
COLORADO; CITY OF ARCATA,
CALIFORNIA; and CITY OF OAKLAND,
CALIFORNIA,

              Plaintiffs,

   v.

PETER WATSON and PHILLIP MERRILL,

              Defendants.

_____/

No. C 02-4106 JSW

**ORDER DENYING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Now before the Court is the motion for summary judgment on standing and other jurisdictional issues filed by Defendants Peter Watson, in his official capacity as President and Chief Executive Officer of the Overseas Private Investment Corporation ("OPIC"), and Peter Merrill, in his official capacity as Vice Chairman and First Vice President of the Export-Import Bank of the United States ("Ex-Im"). Having carefully reviewed the parties' papers, and the relevant legal authority, and good cause appearing, the Court DENIES Defendants' motion.[1]

**FACTUAL BACKGROUND**

Plaintiffs initiated this action against Defendants pursuant to the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4335 ("NEPA") and the Administrative Procedure Act, 5

---

[1]  Also before the Court are Plaintiffs' two pending motions to strike and Plaintiffs' motion for leave to file a surreply. The Court HEREBY DENIES both motions to strike and GRANTS the motion for leave to file a surreply. The surreply brief attached to Plaintiffs' motion for leave is deemed filed.

United States District Court

For the Northern District of California

1   U.S.C. §§ 701-706 ("APA").  OPIC, an independent government corporation, offers insurance

2   and loan guarantees for projects in developing countries.  22 U.S.C. § 2197(a).  OPIC provides

3   political risk insurance covering currency inconvertibility, expropriation or political violence,

4   financing through loan guarantees, and direct loans.  22 U.S.C. § 2194.  Ex-Im, an independent

5   governmental agency and wholly-owned government corporation, provides financing support

6   for exports from the United States.  (Declaration of Barbara O'Boyle ("O'Boyle Decl."), ¶¶ 2,

7   7.)  To support exports, Ex-Im provides a variety of products, including export credit insurance

8   and guarantees.  (O'Boyle Decl., ¶ 10.)  In a typical Ex-Im transaction, a foreign buyer, who has

9   a contract to buy goods or services from a United States' exporter, seeks financing to purchase

10  such goods or services.  Ex-Im's guarantee or insurance covers the risk that a foreign buyer will

11  not pay back a loan to purchase goods or services from a United States' exporter.  (O'Boyle

12  Decl., ¶ 9.)

13          In their complaint, Plaintiffs detail climate changes associated with the effects of global

14  warming and allege continuing adverse environmental impact resulting in injury to their

15  members throughout the country.  Specifically, they allege that OPIC and Ex-Im have provided

16  assistance to particular projects that contribute to climate change without complying with the

17  requirements of the NEPA and the APA.  Plaintiffs seek declaratory and injunctive relief against

18  Defendants.

19          Defendants now move for summary judgment on the following grounds: (1) lack of

20  standing; (2) lack of final agency action; (3) OPIC's organic statute precludes judicial review;

21  and (4) OPIC is not subject to NEPA.

22                                              **ANALYSIS**

23  **A.      Legal Standard.**

24          Summary judgment is proper when the "pleadings, depositions, answers to

25  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

26  genuine issue as to any material fact and that the moving party is entitled to judgment as a

27  matter of law."  Fed. R. Civ. P. 56(c).  A principal purpose of the summary judgment procedure

28  is to identify and dispose of factually unsupported claims.  *Celotex Corp. v. Cattrett*, 477 U.S.

317, 323-24 (1986).  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact").  If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

**B.      Plaintiffs Have Standing to Bring Their Claims.**

Defendants contend that Plaintiffs' alleged injuries regarding the implications of climate change do not amount to the type of injury required to support standing.  (Br. at 2.)  In order to demonstrate Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

When, as here, a plaintiff seeks to challenge a procedural violation, some uncertainty about redressability and causality is allowed.  *Defenders of Wildlife*, 504 U.S. at 573 n.7.  A plaintiff challenging a procedural violation need only show "(1) that he or she is a 'person who has been accorded a procedural right to protect [his or her] concrete interests' . . . and (2) that

*United States District Court*

*For the Northern District of California*

3

United States District Court

For the Northern District of California

1    the plaintiff has 'some threatened concrete interest . . . that is the ultimate basis of [his or her]

2    standing.'" *Douglas County v. Babbitt*, 48 F.3d 1495, 1500 (9th Cir. 1995) (quoting *Defenders*

3    *of Wildlife*, 504 U.S. at 573 n.7). The threat must derive at least in part from the actions at issue

4    in the case and not from some cause or party not before the court. *Ecological Rights*

5    *Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000). Defendants contend

6    that Plaintiffs have not demonstrated an injury in fact, causation or redressability.

7            **1.      Plaintiffs Sufficiently Demonstrate An Injury In Fact.**

8            To demonstrate standing in cases raising procedural issues, environmental plaintiffs need

9    not show that substantive environmental harm is imminent. *Cantrell v. City of Long Beach*, 241

10   F.3d 674, 679 n.4 (9th Cir. 2001) (citing *Defenders of Wildlife*, 504 U.S. at 572 n.7). Moreover,

11   such plaintiffs need not present proof that the challenged federal project will have particular

12   environmental effects. To do so "would in essence be requiring the plaintiff to conduct the

13   same environmental investigation that he seeks in his suit to compel the agency to undertake."

14   *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 972 (9th Cir. 2003).

15   Instead, the "'asserted injury is that environmental consequences might be overlooked' as a

16   result of deficiencies in the government's analysis under environmental statutes." *Id*. at 971-72

17   (quoting *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994)).

18   Thus, Plaintiffs only need to demonstrate that "it is reasonably probable that the challenged

19   action will threaten their concrete interests." *See Citizens for Better Forestry*, 341 F.3d at 969-

20   70; *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).[2]

21           Plaintiffs have done so here. While they concede that the impact of greenhouse gas

22   emissions traceable to projects supported by OPIC and Ex-Im are not yet known with absolute

23   certainty (Opp. Br. at 9), Plaintiffs contend the only uncertainty is with respect to how great the

24   consequences will be, and not whether there will be any significant consequences. (Declaration

25   of Dr. Michael C. MacCracken ("MacCracken Decl."), ¶ 6b.) Moreover, Plaintiffs present

26

27           [2] A plaintiff must also demonstrate that a government agency violated certain
     procedural rules and that these rules protect a plaintiff's concrete interests. *See Citizens for*
28   *Better Forestry*, 341 F.3d at 969-70. However, because these aspects of the injury in fact test
     are not disputed here, the Court need not address them.

4

United States District Court

For the Northern District of California

1   evidence demonstrating that projects supported by OPIC and Ex-Im are directly or indirectly

2   responsible for approximately 1,911 million tonnes of carbon dioxide and methane emissions

3   annually, which equals nearly eight percent of the world's emissions and is equivalent to one-

4   third of the total carbon emissions from the United States in 2003.  (Declaration of Richard

5   Heede, ¶ 14.)  Plaintiff's evidence, if true, further demonstrates that: (1) increased greenhouse

6   gases are the major factor that caused global warming in the twentieth century, (2) global

7   warming that has already occurred has had significant environmental consequences, (3)

8   continued increases in greenhouse gas emissions would continue to increase global warming

9   with consequent widespread environmental impacts, (4) and that these impacts have and will

10  effect areas used and owned by Plaintiffs.  (MacCracken Decl., ¶¶ 6, 12-39; Declaration of Dr.

11  Phillip Dustan, ¶¶ 5-13; Declaration of Randall L. Hayes, ¶¶ 5-17; Declaration of Brian Jeffrey

12  Johnson, ¶¶ 10-26; Declaration of Mark Andre, ¶¶ 5-14; Declaration of Carol D. Ellinghouse, ¶¶

13  3-8).

14          Defendants contest the credibility of Plaintiffs' evidence.  (Reply Br. at 6-9.)  However,

15  "[i]n considering a motion for summary judgment, the court may not weigh the evidence or

16  make credibility determinations, and is required to draw all inferences in a light most favorable

17  to the non-moving party."  *Freeman*, 125 F.3d at 735.  The Court concludes that Plaintiffs'

18  evidence is sufficient to demonstrate it is reasonably probable that emissions from projects

19  supported by OPIC and Ex-Im supported projects will threaten Plaintiffs' concrete interests.[3]

20          **2.      Plaintiffs Sufficiently Demonstrate Causation and Redressability**.

21          In cases asserting a procedural challenge, once a plaintiff establishes an injury in fact, the

22

23          [3]  Defendants reliance on *Center for Biological Diversity v. Abraham*, 218 F. Supp. 2d
    1143, 1155 (N.D. Cal. 2002), for the proposition that Plaintiffs' concerns regarding global
24  warming are insufficient to demonstrate standing, is misplaced.  First, although the district
    court held that concerns regarding global warming in that case were "too general, too
25  unsubstantiated, too unlikely to be caused by defendants' conduct, and/or too unlikely to be
    redressed by the relief sought to confer standing," *id.*, the district court did not describe the
26  evidence on which it based this decision.  Without such a description, this Court cannot make
    a comparison to the evidence before it in this matter.  Second, and more importantly, *Center
27  for Biological Diversity* was decided before the Ninth Circuit clarified in *Citizens for Better
    Forestry* that environmental plaintiffs raising procedural concerns need not present proof that
28  the challenged federal project will have particular environmental effects.  *Citizens for Better
    Forestry*, 341 F.3d at 972.

1   causation and redressability standards are relaxed.  *Defenders of Wildlife*, 504 U.S. at 572 n.7;

2   *see also Citizens for Better Forestry*, 341 F.3d at 975.  Defendants contend that Plaintiffs have

3   not demonstrated causation or redressability.

4           **a.**    **Causation.**

5          Causation is only implicated where there is a concern that "an injury caused by a third

6   party is too tenuously connected to the acts of the defendant."  *Citizens for Better Forestry*, 341

7   F.3d at 975 (citing *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir.

8   1992)).  Here, any concern that Plaintiffs' asserted injuries are caused by third parties must be

9   evaluated in light of lower threshold for causation in procedural injury cases.  *See Public Citizen*

10  *v. Dep't of Transp.*, 316 F.3d 1002,1017-18 (9th Cir. 2003), *rev'd on other grounds*, *Dep't of*

11  *Transp. v. Public Citizen*, 541 U.S. 742 (2004); *see also Cantrell*, 241 F.3d at 682 (holding

12  district court erred by failing to acknowledge the plaintiff's reduced burden to prove causation

13  and redressability).  In *Defenders of Wildlife*, the Supreme Court explained when a plaintiff

14  asserts a procedural injury, such as a plaintiff challenging an agency's failure to prepare an

15  environmental impact statement for a proposed dam, they plaintiff would have standing to

16  challenge the agency's conduct "even though he cannot establish with any certainty that the

17  statement will cause the license to be withheld or altered and even though the dam will not be

18  completed for many years."  *Id*. at 572 n.7.  The fact that it was uncertain whether the company

19  seeking the agency's approval would ever build the dam even if the license were granted also

20  did not undermine such a plaintiff's standing.  *Public Citizen*, 316 F.3d at 1018 (commenting on

21  the example in *Defenders of Wildlife*).  Morever, because the asserted injury in a procedural

22  injury case is that environmental consequences might be overlooked, to demonstrate standing a

23  plaintiff need not show that the ultimate outcome would be different if the procedures were

24  followed.  *Idaho Conservation League*, 956 F.2d at 1518.

25         Nevertheless, Defendants argue that Plaintiffs cannot demonstrate causation because the

26  Ex-Im's and OPIC's role with respect to the projects which produce the greenhouse gas

27  emissions is too limited and attenuated.  Defendants submit evidence to demonstrate that

28  generally, for the large energy-related projects referenced in Plaintiffs' complaint, third parties

*United States District Court*

*For the Northern District of California*

6

have already completed basic design and planning stages for the projects before applying for financial support from Ex-Im or OPIC. (Boyle Dec., ¶ 41; Declaration of Harvey Himberg ("Himberg Decl."), ¶ 19.) Defendants further argue that most large energy-related projects in which either agency is involved would proceed without their support. (Br. at 16; Boyle Dec., ¶ 30; Himberg Decl., ¶¶ 8, 23, 29, 30, 37.) However, Plaintiffs submit evidence demonstrating a stronger link between the agencies' assistance and the energy-related projects. For example, Ex-Im has stated that it "supports export sales that otherwise would not have gone forward." (Ex-Im Administrative Record, Tab 4 at 2 and Tab 5 at 2.) And OPIC has stated that when it determines which projects to support, it evaluates them "to ensure they would not have gone forward but for OPIC's participation." (Plaintiffs' Ex. 14 at 10.)[4] Defendants have not submitted any authority demonstrating, in light of the reduced standard for procedural injuries, that Plaintiffs' have not met their burden regarding causation. Considering the lower threshold for causation in procedural injury cases, the Court concludes that Plaintiffs have sufficiently demonstrated causation.

> **b.    Redressability.**

With respect to redressability, a plaintiff "who asserts inadequacy of a government agency's environmental studies ... need not show that further analysis by the government would result in a different conclusion. It suffices that the [agency's] decision *could be influenced* by the environmental considerations that [the relevant public statute] requires an agency to study." *Citizens for Better Forestry*, 341 F.3d at 975 (emphasis in original). Here, Plaintiffs are asserting that OPIC and the Ex-Im failed to conduct an environmental assessment under NEPA. The Court finds that Plaintiffs have demonstrated that OPIC and Ex-Im's decisions *could be* influenced by further environmental studies, Plaintiffs' have sufficiently demonstrated redressability.

---

[4] In response, Defendants attempt to discredit this evidence by submitting additional evidence to demonstrate the true meaning of the agencies' statements. Again, "[i]n considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman*, 125 F.3d at 735.

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1    **C.    Plaintiffs Challenge A Final Agency Action**.

2           When, as here, Plaintiffs seek review of an agency's conduct under the general review

3    provisions of the APA, rather than pursuant to specific authorization in the substantive statute,

4    such as NEPA, Plaintiffs must demonstrate the agency action they are challenging was a "final

5    agency action." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990) (*citing* 5

6    U.S.C. § 704 ("Agency action made reviewable by statute and *final* agency action for which

7    there is no other adequate remedy in a court are subject to judicial review") (emphasis added)).

8           Citing *National Wildlife Federation*,  *Norton v. Southern Utah Wilderness Alliance*, 542

9    U.S. 55, 124 S. Ct. 2373 (2004), and *Sierra Club v. Peterson*, 228 F.3d 559 (5th Cir. 2000),

10   Defendants argue that Plaintiffs are making a broad programmatic challenge that does not

11   qualify as "final agency action" as required under the APA.  Under the APA, a plaintiff cannot

12   seek wholesale improvement of a program, but rather, must direct his or her suit against some

13   particular "agency action" that causes him or her harm.  *National Wildlife Federation*, 497 U.S.

14   at 891.

15          In *National Wildlife Federation*, the plaintiff alleged that government agencies violated

16   the Federal Land Policy and Management Act of 1976 ("FLPMA") and NEPA in the course of

17   administering what the plaintiff called the "land withdrawal review program" of the Bureau of

18   Land Management ("BLM"). *Id*. at 875.  The plaintiff claimed the agencies violated FLPMA by

19   failing to "develop, maintain, and when appropriate, revise land use plans which provide by

20   tract or areas for use of the public lands," by failing to consider multiple uses for the lands at

21   issue, and failing to provide public notice of decisions.  The plaintiff further asserted that the

22   agencies violated NEPA by failing to provide environmental impact statements on their

23   proposed actions.  *Id*. at 879.  The Court found that the so called "land withdrawal review

24   program" was not derived from any statutory language and did not refer to any "single BLM

25   order or regulation, or even a completed universe of particular BLM orders or regulations."  *Id*.

26   at 890.  Rather, the "land withdrawal review program" was "simply the name by which [the

27   agencies] have occasionally referred to the continuing (and thus constantly changing) operations

28   of the BLM in reviewing withdrawal revocation applications and the classifications of public

1    lands and developing land use plans." *Id*.  The Court likened the plaintiff's claim to one

2    attempting to challenge a "'weapons procurement program' of the Department of Defense or a

3    'drug interdiction program' of the Drug Enforcement Agency."  Accordingly, the Court held that

4    the plaintiff's challenge was too broad and generic to constitute "final agency action."  *Id*.

5             Similarly, in *Southern Utah Wilderness Alliance*, the Supreme Court again rejected a

6    challenge to agency action that was not sufficiently discrete or specific.  *Southern Utah

7    Wilderness Alliance*, 124 S. Ct. at 2381.  The plaintiff asserted, *inter alia*, that the "BLM

8    violated its mandate to 'continue to manage [wilderness study areas] . . . in a manner so as not to

9    impair the suitability of such areas for preservation as wilderness," by allowing degradation

10   caused by off-road vehicles.  *Id*. at 2380.  The Court concluded that the plaintiff was improperly

11   seeking to compel compliance with broad statutory mandates, which would require pervasive

12   judicial oversight of the agency's day-to-day activities.  Therefore, the Court held that the

13   plaintiff could not pursue the claim.  *Id*. at 2381.

14           In *Sierra Club*, the plaintiffs sought "wholesale improvement" of the Forest Service's

15   timber management "program" in the Texas forests, "objecting to Forest Service practices

16   throughout the four National Forests in Texas and covering harvesting from the 1970s to timber

17   sales which have not yet occurred."  *Sierra Club*, 228 F.3d at 566.  In finding the plaintiffs were

18   not challenging a final agency action, the Fifth Circuit reasoned that "as in *Lujan*, the

19   environmental groups have impermissibly attempted to 'demand a general judicial review of the

20   [Forest Services's] day-to-day operations.'"  *Id*. (quoting *National Wildlife Federation*, 497 U.S.

21   at 899).

22           Here, Plaintiffs challenge Ex-Im's and OPIC's determinations that the projects they

23   support do not have significant environmental impacts and thus, have not conducted any

24   environmental assessments.  Plaintiffs point to evidence demonstrating that both Ex-Im and

25   OPIC: (1) evaluated whether the projects they support contribute to the production of

26   greenhouse gases and climate change; (2) conducted these evaluations based on the aggregate

27   portfolios of projects they support, as opposed to on an individual project basis; and (3)

28   determined that their cumulative projects result in greenhouse gas emissions but do not have a

significant environmental impact.  (Ex-Im Administrative Record, Tab 1; Plaintiffs' Ex. 3.)

Neither Ex-Im nor OPIC conducted environmental assessments in making these determinations.

In fact, both agencies have concluded that NEPA does not apply to their project approvals.  (*Id*.;

OPIC Administrative Record at 4368-370.)  Merely because Plaintiffs' suit concerns the

environmental impact of the projects supported by Ex-Im and OPIC as a group, rather than

individually, does not convert Plaintiffs' challenge into a broad programmatic attack prohibited

by *National Wildlife Federation*.  As the Supreme Court itself noted in *National Wildlife*

*Federation*, it would be appropriate to challenge a "universe" of particular orders under the

APA.  *National Wildlife Federation*, 497 at 890.  Plaintiffs' suit does not broadly challenge the

day-to-day operations of Ex-Im or OPIC, but rather, challenges those agencies' discrete

determinations that the projects they support do not, on a cumulative basis, have a significant

environmental impact.  Accordingly, the Court denies Defendants' motion for summary

judgment on this basis.

**D.      OPIC's Organic Statute Does Not Preclude Judicial Review.**

A statute may preclude judicial review under the APA.  5 U.S.C. § 701(a)(1).  However,

"[t]he statutory preclusion of judicial review must be demonstrated clearly and convincingly."

*N.L.R.B. v. United Food and Commercial Workers Union Local 23*, 484 U.S. 112, 131 (1987).

If there is no "statutory language expressly precluding APA review, the Court must examine the

structure and history of the statute to determine whether the requisite congressional intent to bar

judicial review is clearly established."  *Id*.

Defendants contend that the plain language of OPIC's organic statute reveals that

Congress intended to shield OPIC from judicial review of compliance with various statutory

obligations, including its obligation to consider environmental implications of its proposed

actions.  To demonstrate such intent, Defendants cite a portion of OPIC's statute which

provides: "Each guaranty contract executed by such officer or officers as may be designated by

the Board shall be conclusively presumed to be issued in compliance with the requirements of

this chapter."  (Br. at 30, quoting 22 U.S.C. § 2197(j).)  Because the OPIC statute also includes

environmental review procedures, Defendants argue that the above provision deems all

environmental review by OPIC to be in compliance with the law and not subject to judicial review.  (Br. at 30.)

In *Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 695 (9th Cir. 2003), the court held judicial review under the APA was precluded by a statute which provided "no court shall have jurisdiction to review."  Similarly, in *Southwest Williamson County Community Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1038 (6th Cir. 1999), the court held that a statute, which stated that "any decision by the Secretary concerning a plan or program described in this section shall not be considered to be a Federal action subject to review under [NEPA]," precluded judicial review.  The statutory provisions precluding judicial review in *Spencer Enterprises* and *Southwest Williamson County* are clear and direct.  In contrast, the provision pointed to by Defendants in OPIC's statute merely references what presumption the agency's conduct is given.  It is silent with respect to judicial review.  Defendants have not provided any authority demonstrating that similar language has been found to preclude judicial review.  The Court thus concludes that this provision does not "clearly and convincingly" demonstrate Congressional intent to preclude judicial review.  *See United Food and Commercial Workers Union*, 484 U.S. at 131.

**E.**     **Environmental Procedures In OPIC's Statute Do Not Displace NEPA.**

Finally, Defendants argue that Congress decided not to apply NEPA to OPIC.  In two cases, the Ninth Circuit has held that NEPA did not apply to actions taken pursuant to other environmental statutes.  *See Merrell v. Thomas*, 807 F.2d 776 (9th Cir. 1986); *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995).  The court in *Merrell* held that the Environmental Protection Agency ("EPA") does not need to comply with NEPA when it registers pesticides pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136-136y ("FIFRA").  *Merrell*, 807 F.2d at 777.  In 1972, after NEPA was enacted, Congress comprehensively amended FIFRA, in part to respond to increasing public concern over environmental protection.  At this time, Congress gave no indication that it thought NEPA would apply, but instead, created a registration procedure within FIFRA to ensure consideration of environmental impacts.  The FIFRA procedure did not exactly mirror the procedures in

11

1    NEPA, and reflected a compromise between environmentalists, farmers, and manufacturers. *Id.*

2    at 778.  Congress then amended FIFRA again in 1975, 1978 and 1984 when it was clear that

3    EPA had interpreted FIFRA as not requiring compliance with NEPA.  The court noted that

4    "when Congress revisits a statute giving rise to a longstanding administrative interpretation

5    without pertinent change, the congressional failure to revise or repeal the agency's interpretation

6    is persuasive evidence that the interpretation is the one intended by Congress." *Id.* (quotations

7    and citiations omitted).  Moreover, the court found it significant that the 1978 amendments were

8    designed to lighten the regulatory burdens.  *Id.*  Thus, the court held that Congress did not intend

9    NEPA to apply to FIFRA registrations.  *Id.* at 781.

10        In *Douglas County*, the Ninth Circuit held that NEPA did not apply to a decision by the

11    Secretary of the Interior to designate critical habitat under the Endangered Species Act, 16

12    U.S.C. § 1533 ("ESA").  *Douglas County*, 48 F.3d at 1504.  The court found that ESA's

13    legislative history demonstrated the same Congressional intent that NEPA did not apply as

14    exhibited by FIFRA's legislative intent examined by the court in *Merrell*.  Eight years after

15    NEPA was enacted, Congress amended the ESA to provide a procedure for designating critical

16    habitat.  The committee report indicated that members wished to introduce some flexibility into

17    the stringent ESA requirements.  *Id.* at 1503.  The *Merrell* court found that the procedures

18    created by Congress in ESA displaced NEPA's procedural and informational requirements and

19    thus, made the NEPA procedure superfluous.  *Id.*  Moreover, aspects of the ESA mandate as

20    amended conflicted with NEPA's requirements.  The *Merrell* Court also found it significant that

21    Congress amended ESA again, after another circuit court held that NEPA did not apply when

22    the Secretary of the Interior listed a species as threatened or endangered and suggested in dicta

23    that the process of designating critical habitat might be the functional equivalent of NEPA

24    procedures, and after the Secretary of the Interior announced that he was not going to follow

25    NEPA before making critical habitat designations.  Yet, Congress did not provide that NEPA

26    applied to designating critical habitat under ESA.  *Id.* at 1504.  Therefore, the court concluded

27    that Congress did not intend NEPA to be applicable.  The court also found that NEPA did not

28    apply for an additional reason - designating critical habitat does nothing to alter the natural

physical environment. *Id*. at 1505.

Although Defendants argue that the legislative history of OPIC's statute evinces the same Congressional intent to displace NEPA as in *Merrell* and *Douglas County*, the record reveals otherwise.  In essence, Defendants point to legislative history indicating, at most, that Congress provided that OPIC should follow some procedures to protect the environment. Conspicuously absent from the record is any evidence that Congress amended OPIC's statute *after* OPIC interpreted its statute to displace NEPA.  Defendants' only evidence evincing any Congressional intent on this issue is a discussion regarding the deletion of a reference to NEPA, but this discussion occurred at the time when the statute was not yet applicable to OPIC. (Defendants' Ex. 4h.)  Based on this record, the Court cannot conclude that Congress intended NEPA not to apply to OPIC.

## CONCLUSION

For the foregoing reasons, the Court finds that (1) Plaintiffs sufficiently demonstrate standing; (2) Plaintiffs are challenging final agency actions; (3) OPIC's statute does not preclude judicial review; and (4) Environmental procedures in OPIC's statute do no displace NEPA. Accordingly, the Court DENIES Defendants' motion for summary judgment.

**IT IS SO ORDERED.**

Dated: August 23, 2005

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California