1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT
9
10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11   FRIENDS OF THE EARTH, INC., et al.,          No. C 02-04106 JSW

12              Plaintiffs,                        **ORDER DENYING PLAINTIFFS'
                                                   MOTION FOR SUMMARY
13        v.                                       JUDGMENT AND GRANTING IN
                                                   PART AND DENYING IN PART
14   ROBERT MOSBACHER, JR., et al.,                DEFENDANTS' MOTIONS FOR
                                                   SUMMARY JUDGMENT**
15              Defendants.
                                        /
16

17   **I.      INTRODUCTION**.

18           This matter comes before the Court upon consideration of: (1) the motion for summary

19   judgment filed by Plaintiffs[1]; (2) the cross-motion for summary judgment filed by Defendant

20   Robert Mosbacher, Jr., in his capacity as President and Chief Executive Officer of the Overseas

21   Private Investment Corporation ("OPIC"); and (3) the cross-motion for summary judgment filed

22   by Defendant Phillip Merrill, in his capacity as President and Chairman of the Export-Import

23   Bank ("Ex-Im").[2]  Having carefully considered the parties' pleadings, relevant legal authority,

24   the record in this case, and having had the benefit of oral argument, the Court HEREBY

25   DENIES Plaintiffs' motion for summary judgment, and GRANTS IN PART AND DENIES IN

26

27           [1]      Plaintiffs are Friends of the Earth, Inc. ("FOE"), Greenpeace, Inc.
     ("Greenpeace"), and the cities of Boulder, Colorado, and Arcata, Oakland, and Santa
28   Monica, California (collectively "Plaintiffs").

             [2]      Plaintiffs also filed a motion to strike portions of Defendants' briefs and to
     strike evidence, which is addressed in a separate order issued this date.

United States District Court
For the Northern District of California

1  PART OPIC's cross-motion for summary judgment, and GRANTS IN PART AND DENIES IN

2  PART Ex-Im's cross-motion for summary judgment.

3  **II.    BACKGROUND.**

4          This case arises out of Plaintiffs' desire to have the Defendants take a hard look at the

5  impact greenhouse gases, emitted by projects for which the Defendants provide financial

6  support, have on the domestic environment.  Global warming and its effects on our planet

7  clearly have gained increased public attention.  The Intergovernmental Panel on Climate

8  Change is set to release its fourth assessment report about the human contribution to climate

9  change.  *See, e.g.,* www.sfgate.com, Kay, *A Warming World: Climate Change Report,* San

10  Francisco Chronicle (Feb. 3, 2007).  The documentary on global climate change, "*An*

11  *Inconvenient Truth,*" received an Academy Award® this year.  California has instituted a

12  lawsuit against automakers seeking damages based on greenhouse gases emitted by

13  automobiles.  *See, e.g.,* www.sfgate.com, Egelko, *A.G. Brown pushes ahead with global*

14  *warming suit against automakers,* San Francisco Chronicle (Feb. 1, 2007).  The issue of

15  whether the Environmental Protection Agency can be compelled to regulate greenhouse gas

16  emissions is pending before the United States Supreme Court.  *See Massachusetts v. EPA*, 415

17  F.3d 50 (D.C. Cir. 2005), *cert. granted*, __ U.S. __, 126 U.S. 2690 (2006).

18          The Court does not doubt that the consequences of global warming will remain a matter

19  of public interest for some time, and it recognizes the importance of the issues raised by this

20  case.  As always, in rendering its decision, the Court must interpret the law in light of the facts

21  and record presented by the parties.

22          **A.    Procedural History.**

23          Plaintiffs initiated this action against OPIC and Ex-Im pursuant to the National

24  Environmental Policy Act, 42 U.S.C. §§ 4321-4335 ("NEPA") and the Administrative

25  Procedure Act, 5 U.S.C. §§ 701-706 ("APA").  Plaintiffs generally allege that each of these

26  agencies have provided, and continue to provide, financial support to international fossil fuel

27  projects that emit greenhouse gases ("GHGs").  Plaintiffs contend these GHG emissions cause

28  climate changes that significantly affect the domestic environment.  (Second Amended

**United States District Court**
For the Northern District of California

2

Complaint ("SAC") ¶¶ 146-211.)  Plaintiffs assert that before they agree to provide financial support for these projects, OPIC and Ex-Im are required to conduct an environmental review under NEPA.  In particular, Plaintiffs assert that each Defendant has an energy "program" that is subject to NEPA's requirements.  Plaintiffs also identify seven "illustrative" projects financed by either OPIC or Ex-Im or by both agencies and contend that each of these seven projects are subject to NEPA's requirements.  (*Id.* ¶¶ 162-203.)

Plaintiffs ask for: (1) "a declaration that defendants violated and are in violation of NEPA and the APA for failing to comply with NEPA;" (2) a declaration that "defendants' programs of financing projects that directly or indirectly emit [carbon dioxide ("$CO_2$")] and each financing decision for particular projects that directly or indirectly emit $CO_2$ are subject to NEPA;" (3) an injunction "requiring the defendants to fully comply with NEPA;" (4) an injunction requiring "defendants to prepare programmatic environmental assessments of [their] support of energy projects;" and (5) an injunction "requiring defendants to prepare environmental assessments for each of [their] fossil fuel related projects including, but not limited to fossil fuel extraction projects and pipelines."  (*See id.* at p. 47.)

On August 23, 2005, the Court denied a motion for summary judgment filed by Defendants and found that: (1) Plaintiffs had standing to pursue their claims against OPIC and Ex-Im; (2) Plaintiffs challenged final agency actions; and (3) OPIC had not demonstrated that its organic statute, the Foreign Assistance Act, precluded judicial review of Plaintiffs' claims under the APA.  The Court also concluded, based on the record then before the Court, that OPIC had not demonstrated that Congress did not intend NEPA to apply to OPIC.  (*See* Docket 117 at 10-13 (hereinafter "August 23 Order").)

The motions for summary judgment now pending address the merits of Plaintiffs' claims.

//

//

//

//

United States District Court

For the Northern District of California

**B.     Factual Background.**[3]

**1.     Overseas Private Investment Corporation.**

OPIC is an agency of the United States created "[t]o mobilize and facilitate the participation of the United States private capital and skills in the economic and social development of less developed countries and areas, and countries in transition from nonmarket to market economies."  22 U.S.C. § 2191.  As part of its statutory mission, OPIC insures investments overseas against a broad range of political risks, finances business overseas through loans and loan guarantees, finances private investment funds that provide equity to businesses overseas, and advocates the interests of the American business community overseas.  (*See* Answer ¶ 18; OPIC Ex. 6 (Declaration of Harvey Himburg dated November 3, 2004 (hereinafter "Himburg Decl.") ¶¶ 3-7).)  Although OPIC may make direct loans, it may do so "only for projects that are sponsored by or significantly involve United States small business or cooperatives."  OPIC cannot provide direct loans "to finance any operation for the extraction of oil or gas."  21 U.S.C. § 2194(c).  OPIC also is "required by statute to operate its programs in a manner consistent with" section 117 of the Foreign Assistance Act (22 U.S.C. § 2151p), which sets forth the environmental requirements applicable to the United States Agency for International Development ("US AID").  (*See, e.g.,* OPIC Administrative Record ("OPIC A.R.") Tab 2 at 000013.)

In 1999, having considered comments from OPIC's users, members of the public, members of Congress, and "general policy initiatives announced by President Clinton at the United Nations Special Session on the Environment in June of 1997," OPIC published an environmental handbook ("OPIC Handbook").  (OPIC A.R. Tab 2 at 000008; *see also* OPIC Exs. 1O-1S.)  The OPIC Handbook was "intended to provide information to OPIC's users, as well as the interested public, with respect to the general environmental guidelines, assessment and monitoring procedures that OPIC applies, in its discretion, to prospective and ongoing investment projects."  (*Id.* Tab 2 at 000008; *see also* Himburg Decl. ¶ 11.)  As further set forth in the OPIC Handbook, "[t]he standards and procedures described [herein] generally reflect

---

[3]     Unless otherwise noted, the facts are undisputed.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  existing practice at OPIC as it has evolved since the enactment in 1985 of statutory

2  environmental provisions applicable to OPIC."  (OPIC A.R. Tab 2 at 000008.)

3      In its handbook, OPIC also states that it is required "to provide some degree of

4  [environmental assessment] to every project considered for insurance or finance in determining

5  whether to provide support for the project."  (*Id.* at 000014.)  "OPIC cannot provide a final

6  commitment to a project ... until its environmental assessment is complete and a determination

7  is made by OPIC that the environmental health and safety impacts of the project are

8  acceptable."  (*Id.*)  It is undisputed that OPIC does not conduct these environmental assessments

9  under the auspices of NEPA.

10     As set forth in the OPIC Handbook, the first step in OPIC's environmental screening

11  procedures is to review an application to determine whether financial support "would violate

12  any categorical prohibition required by OPIC's organic statute or policy."  (*Id.* at 000009,

13  000011-12.)  When a project is not categorically ineligible for OPIC's support, OPIC continues

14  the screening process to "determine the level of environmental sensitivity associated with the

15  industry sector or site involved."  OPIC's Environmental Unit assigns a given project to one of

16  six categories, denominated Categories A-F.  (*Id.*)

17     If a project is identified as a "Category A" project, OPIC requires an "Environmental

18  Impact Assessment" or an "Initial Environmental Audit" or both.  (*Id.* at 000009.)  "Category

19  A" projects are "likely to have significant adverse environmental impacts that are sensitive (e.g.

20  irreversible, affect sensitive ecosystems, involve involuntary resettlement, etc.), diverse, or

21  unprecedented."  (*Id.* at 000011.)  Crude oil refineries, large thermal power projects (200

22  megawatts or more), major oil and gas developments, and oil and gas pipelines, are among the

23  general types of projects that OPIC states would qualify as "Category A" projects.  (*Id.* at

24  000044-45.)

25     Projects identified by OPIC as "Category B" projects "are subject to internal OPIC

26  assessment based on information supplied by the applicant that need not take the form of an

27  [Environmental Impact Assessment]."  (*Id.* at 000009.)  "Category B" projects are "projects

28  likely to have adverse environmental impacts that are less significant than those of Category A

United States District Court

For the Northern District of California

1  projects, meaning that few if any of the impacts are likely to be irreversible, that they are site-

2  specific, and that mitigatory measures can be designed more readily than for Category A

3  projects." (*Id.* at 000011.)  OPIC's environmental assessment process for such projects

4  "normally consists of a limited environmental review, an environmental mitigation or action

5  plan, an environmental audit, or a hazard assessment and incorporating them into the project."

6  (*Id.*)  Both Category A and Category B projects are subject to internal OPIC environmental

7  assessment, which permits OPIC's "environmental staff [to] assess the impacts of the project

8  and the standards and mitigative conditions applicable to OPIC support."  (*Id.* at 000009.)

9        Once OPIC approves financing for a particular project, OPIC will monitor "project

10  compliance with contractual conditions throughout the term of the OPIC loan agreement or

11  insurance contract."  (*Id.* at 000010.)  In a section of the OPIC Handbook entitled "Monitoring

12  and Compliance," OPIC states that it "reserves the right to monitor projects' compliance with

13  environmental representations and undertakings throughout the term of its insurance or

14  financing.  Monitoring may take the form of self-reporting ... [or] third party evaluation... ."

15  (*Id.* at 000027.)  OPIC also states that it "routinely conducts on-site monitoring of projects,

16  using OPIC staff and/or consultants, for environmental and environmentally based social

17  impacts as well as U.S. economic and host country development effects.  OPIC endeavors to

18  monitor all Category A projects on-site at least once during the first three years of project

19  commitment, and more frequently depending on the environmental sensitivity of the project."

20  (*Id.*)  OPIC also requires third-party independent compliance audits for Category A projects.  In

21  general, such audits are designed to take place "after an OPIC supported project begins

22  construction or is operational."  (*Id.*)

23        In the Monitoring and Compliance section, OPIC further sets forth what actions it may

24  take if a recipient of OPIC aid fails to comply with these provisions:

25        Material misrepresentation or non-compliance with environmental
          undertakings may constitute an event of default under the terms of OPIC
26        insurance contracts and loan agreements.  Depending on the severity and
          reversibility of the environmental impact and the investor's responsibility
27        and due diligence in attempting to prevent the default and in curing the
          problem, OPIC may treat the default as curable or incurable.  In the case
28        of a curable default, OPIC works with the investor to develop a feasible
          timetable for remediation.  *In the case of an incurable default, OPIC may*

6

*require contract termination in the case of insurance, or an acceleration of the repayment or other available lenders' remedies, in the case of a loan.* If an equity investment on the part of a financial intermediary (FI) is involved, divestiture by the FI may be required. Additionally, failure to meet contractually required reporting requirements can constitute a default. In all cases, OPIC seeks to work cooperatively with investors and lenders to arrive at an equitable resolution of the situation, taking into account the requirements of other lenders and insurers.

(*Id.* at 000028 (emphasis added).)

The OPIC Handbook also contains a section on Climate Change and Renewable Energy. In that section, OPIC states that it "tracks and reports, on an aggregate basis, the annual greenhouse gas emissions from its power sector projects. OPIC will track and report, on an aggregate basis, the annual greenhouse gas emissions from other greenhouse gas emitting projects to the extent an appropriate Framework is available. Aggregate tracking results will be available to the public and reported annually to Congress in OPIC's Annual Environmental Report." (*Id.* at 000025.)

## 2. Export-Import Bank.

Ex-Im is an independent governmental agency and wholly-owned government corporation that provides financing support for exports from the United States. *See* 12 U.S.C. § 635. To support exports, Ex-Im provides a variety of products, including export credit insurance and guarantees. (Ex-Im Ex. 1 (Declaration of Barbara O'Boyle (hereinafter "O'Boyle Decl.") ¶¶ 2-12).) In general, Ex-Im offers guarantees to commercial banks and other financial institutions in connection with exports of U.S. capital goods and services, a variety of insurance products for short- or medium-term credits, direct loans, and guarantees for working capital loans made by commercial banks to U.S. exporters. These products purportedly enable U.S. exporters to, *inter alia*, purchase finished products for exports, pay for raw materials, cover standby letters of credit serving as bid bonds, or finance foreign receivables. (*Id.* ¶ 10; *see also* Ex-Im Administrative Record ("Ex-Im A.R.") Tabs 3-6 (Ex-Im Annual Reports).)

In a typical Ex-Im Bank transaction, a buyer seeks to purchase goods or services for their general use or for use in a specific project. A U.S. exporter, often after competing against foreign suppliers, enters into an export sales contract with the foreign buyer. Such contract is typically contingent on securing necessary financing. When a buyer is unable to secure necessary financing from private sources or where there is foreign

competition, Ex-Im Bank may provide its guarantee or insurance to enable the foreign buyer to purchase the U.S. exports.  For eligible transactions, the Ex-Im Bank insurance or guarantee covers the risk that the foreign buyer will not (or cannot) pay back the loan for any reason.  In the event the borrower does not repay the loan, the guaranteed lender/insured may make a claim against Ex-Im Bank to be compensated for the loss.

(O'Boyle Decl. ¶ 9.)

Like OPIC, Ex-Im also has adopted environmental review procedures.  According to Ex-Im's Environmental Procedures and Guidelines ("Ex-Im Guidelines"), "those projects which may significantly affect the quality of the human environment of the U.S., its territories or possessions, or Antarctica, ... require adherence to [NEPA's] environmental review procedures."  (Ex-Im A.R. Tab 2 (Ex-Im Guidelines) at 3.)  Pursuant to the Ex-Im Guidelines, Ex-Im requires that all limited recourse project finance ("Project Finance") and long-term loans and guarantees ("Long-Term") undergo an environmental screening process.  In contrast, Ex-Im generally does not require prior environmental review for medium-term transactions, credit guarantee facilities, short-term insurance, or for its working capital guarantee program.  (*Id.* at 4, 10-11.)

For any Project Finance or Long-Term transaction that requires prior environmental review, Ex-Im will categorize the transaction a "N," "A," "B," or "C."  (*Id.* at 4-5.)[4]  Category A transactions encompass those transactions that are "categorically excluded from review because individual cases do not raise significant environmental issues."  (*Id.*)  Examples of Category A projects are (1) exports not identified with any particular project, or (2) the export is identified with a project, the project is not in category B or C, and the project "is one of the following: aircraft, locomotives, railway signaling, telecommunications equipment involving only a nominal element of civil works, radar equipment for existing airports, air traffic control systems, satellite projects, electronic data processing equipment for existing facilities, hospital equipment, and consulting services including environmental studies and feasibility studies."  (*Id.*)

---

[4]    Category N projects are transactions associated with nuclear power projects and are subject to separate procedures and guidelines.  (Ex-Im Guidelines at 4.)

**United States District Court**
For the Northern District of California

1    Category B transactions are those that involve "exports for projects that will be

2    constructed in, or sufficiently near to have perceptible environmental effects in, the following

3    locations: primary forests, tropical forests, nationally designated wetlands, protected wetlands,

4    national parks, nationally-designated refuges, coral reefs or mangrove swamps, nationally-

5    designated seashore areas, habitat of endangered species, properties on the World Heritage List,

6    areas reserved for ethnic minorities or indigenous peoples, or areas in which the projects will

7    require large-scale resettlement."  (*Id.* at 5.)

8    Category C transactions include "all Long-Term transactions that are not classified as

9    Category A or B.  [Ex-Im's Engineering & Environment Division ("E&E")] staff will conduct a

10   case-by-case review of all transactions included in Category C.  For review of Category C

11   transactions, Ex-Im ... requires submission of environmental information sufficient to establish

12   whether the project meets Ex-Im Bank's environmental objectives and guidelines," as set forth

13   in Annex A to the Ex-Im Guidelines.  (*Id.*)

14   If Ex-Im "determines that a project satisfies the Ex-Im Bank environmental guidelines in

15   all respects, including quantitative and qualitative, Ex-Im Bank support for exports will not be

16   rejected on environmental grounds."  (*Id.* at 3.)  If, however, a given project "does not meet all

17   Ex-Im Bank environmental guidelines, the Ex-Im Bank Board of Directors will review the

18   environmental effects of the project on a case-by-case basis, taking account of significant

19   mitigating effects and circumstances."  (*Id.*)  As set forth in the Ex-Im Guidelines, "[f]inancing

20   may be conditioned on the implementation of mitigating measures."  (*Id.*)  The Ex-Im

21   Guidelines contain a section entitled "Project Financing," which states that "E&E staff will

22   provide guidance to the [project] applicant to help identify significant environmental problems

23   and to assist in determining how the project can be designed, including mitigation measures, to

24   meet Ex-Im Bank's environmental objectives and guidelines."  (*Id.* at 5.)

25   In the Ex-Im Guidelines, Ex-Im states that "[t]o assist in the management of global

26   greenhouse gas emissions, beginning in fiscal year 1999, Ex-Im will track the estimated amount

27   of [$CO_2$] emissions from projects it supports in the power sector and, to the extent practical,

28   from projects in other sectors that may cause significant production of $CO_2$.  The estimated

United States District Court

For the Northern District of California

1   annual amount of the aggregate greenhouse gases from these projects will be reported annually

2   in Ex-Im's Annual Report."  (*Id.* at 3.)

3               **3.       The Projects Identified in the SAC.**

4         Plaintiffs have identified seven "illustrative" projects, in the SAC, that they claim are

5   subject to NEPA requirements.  These projects are: (1) the Chad-Cameroon Oil Pipeline

6   Project; (2) the Sakhalin Oil Field Project; (3, 4) the West Seno I and II Oil and Gas Fields

7   Project; (5) the Cantarell Oil Field Project; (6) the Hamaca Heavy Crude Oil Development

8   Project; and (7) the Dezhou Coal-Fired Power Plant Project.

9               **a.       Chad-Cameroon Pipeline Project.**

10        The Chad-Cameroon Pipeline Project ("Chad-Cameroon Project") involves "a 1,070 km

11  pipeline" from Doba, Chad to Kribi, Cameroon.  (Himburg Decl. ¶ 19; O'Boyle Decl. ¶ 32;

12  SAC ¶ 164.)  It is part of a larger project, which involves the development of oil fields in Chad

13  and offshore oil-loading facilities located off the Cameroon coastline, known as the

14  Chad/Cameroon Petroleum Development and Pipeline Project (the "Development Project").

15  (*See* OPIC Ex. 13 (Declaration of Harvey Himburg dated January 20, 2006 (hereinafter "Supp.

16  Himburg Decl.") ¶ 5); OPIC Ex. 1NN at 66.) According to OPIC, the total cost of the larger

17  Development Project is estimated at $3.5 billion.  (Supp. Himburg Decl. ¶ 5; OPIC Ex. 1NN.)

18  Ex-Im attests that the total cost of the Chad-Cameroon Project is estimated at $2.2 billion.

19  (O'Boyle Decl. ¶ 33.)

20        OPIC is involved with the Chad-Cameroon Project because it approved up to $250

21  million in political risk insurance coverage for Pride International, Inc. ("Pride"), a

22  subcontractor on the Chad-Cameroon Project that provides drilling and related services in the

23  oil fields at Doba.  (Himburg Decl. ¶ 19; Supp. Himburg Decl. ¶ 3; OPIC Exs. 1LL-1NN.)

24  According to Mr. Himburg, the contract between OPIC and Pride provides for a maximum

25  payout of $100 million, and Pride pays OPIC $1.1 million a year for the coverage.  (Himburg

26  Decl. ¶ 22.)

27        OPIC designated the Chad-Cameroon Project as a Category B project and conducted an

28  environmental assessment under its environmental guidelines before approving the transaction.

1  (*Id.*; OPIC Ex. 1MM (Commitment Letter); OPIC Ex. 1NN (OPIC environmental assessment,

2  explaining that Chad-Cameroon Project was evaluated as Category B but that the Development

3  Project "was reviewed as a Category A project by the World Bank and IFC prior to Board

4  Approval").)  According to OPIC's environmental assessment, "OPIC is not involved in

5  financing or providing direct insurance support to the" Development Project.  (OPIC Ex. 1NN

6  at 66.)

7       The financing contract between Pride and OPIC contains the following provision:

8        The Insured [Pride] shall take, and shall cause the contractor [Pride
         Forasol, SAS] to take, each of the following actions, it being agreed that

9        the failure in any material respect to do so shall constitute a default:
            (i) perform all project activities in compliance with the Oil and

10       Gas (Onshore) Guidelines as published in the World Bank Group's
         Pollution Prevention and Abatement Handbook, dated July 1998 (attached

11       hereto as Exhibit A) and the agreement as applicable to the project; and,
            (ii) notify OPIC immediately, and in no event later than 24 hours

12       after the Insured becomes aware, or should have become aware through
         the exercise of reasonable diligence and care, of an accident that results in

13       the loss of human life or that has or that could reasonably be foreseen to
         have a material adverse impact on the environment.

14

15 (OPIC Ex. 1NN at 87; *see also* OPIC Ex. 1MM at 83-84.)

16      Ex-Im also is involved with the pipeline portion of the Chad-Cameroon Project, which it

17 designated as a "Category B" project.  (Ex-Im A.R. Tab 24 at 8.)  Ex-Im provided ABN AMRO

18 Bank N.V. with a $200 million loan guaranty but did not provide financing for the Development

19 Project.  (O'Boyle Decl. ¶ 32.)  According to Ms. O'Boyle, the loan guaranty "covered political

20 risks (primarily war and civil unrest, expropriation and transfer risks) during the construction of

21 the pipeline and comprehensive (non-payment for any reason) guarantee when the pipeline was

22 completed and operating."  (*Id.* ¶ 33.)  Ex-Im attests that the guaranty "represents

23 approximately 9.1% of the $2.2 billion development costs of the pipeline system."  (*Id.*)  The

24 record in this case does not include any of the terms of that guaranty.

25      Ex-Im performed an environmental review of the Chad-Cameroon Project, in

26 accordance with its environmental guidelines.  (Ex-Im Ex. 4 (Declaration of James Mahoney

27 dated January 20, 2006 (hereinafter "Supp. Mahoney Decl.") ¶ 6); *see also* Ex-Im A.R. Tab 24

28 at 8.)  A complete copy of the Ex-Im environmental review is not part of the record.  Ex-Im has

United States District Court

For the Northern District of California

1   included a copy of an Engineering Evaluation for the project.  The Engineering Evaluation does

2   not set forth what conditions, if any, Ex-Im imposed on financing nor does it provide any

3   substantive analysis of the project.  (*See* Ex-Im A.R. Tab 24 at 8.)

4                    **b.      Sakhalin Oil Field Project.**

5          The Sakhalin Oil Field Project ("Sakhalin Project") involves the development of an oil

6   and gas extraction project of the Piltun-Astokhskoye offshore oil and gas field, which is located

7   east of Sakhalin Island in far-east Russia.  (Himburg Decl. ¶¶ 24-25; OPIC Ex. 1KK; SAC ¶¶

8   182, 185.)  This project consists of the "modification of an existing, ... mobile arctic offshore

9   drilling rig (Molikpaq), construction of a ... subsea pipeline, and ... utilization of ... storage and

10  offloading unit (FSO) from which oil will be offloaded to shuttle tankers."  (OPIC Ex. 1KK at

11  121 (ellipses denote redactions in exhibit).)  The Sakhalin Energy Investment Company

12  ("SEIC"), which is a joint venture between, *inter alia*, Shell Development Sakhalin B.V., Mitsui

13  Sakhalin Development Co., and Mitsubishi, operates the Sakhalin Project.  (Himburg Decl. ¶

14  24; OPIC Ex. 1KK at 121.)  OPIC avers that the total cost for the Sakhalin Project is $1.5

15  billion.  (Supp. Himburg Decl. ¶ 9.)

16         OPIC is involved with the Sakhalin Project because it approved a $116 million loan

17  guaranty to three U.S. mutual funds, which in turn loaned funds to SEIC for the project.

18  (Himburg Decl. ¶ 26; Supp. Himburg Decl. ¶ 7.)  OPIC designated the project as a Category A

19  project and conducted an environmental assessment under its environmental guidelines before it

20  approved the transaction.  (*Id.* ¶ 26; OPIC Ex. 1KK at 154.)  The OPIC environmental

21  assessment contains a number of recommendations, including a recommendation that "the

22  project must operate strictly by the plans that have been established in the attached

23  [Environmental Action Plan]."  (OPIC Ex. 1KK at 154.)  The Environmental Action Plan states

24  that it "was developed in response to environmental investigations (in most cases, findings

25  arising from audits or assessments carried out by [SEIC] as part of the Senior Lenders' due-

26  diligence requirement)."  (*Id.* at 158.)  The Environmental Action Plan also shows that the

27  senior lenders on the project have required an audit program.  (*Id.* at 164.)

28

United States District Court

For the Northern District of California

        c.    **West Seno I and West Seno II Oil and Gas Fields Projects.**

The West Seno I Oil and Gas Field Project ("West Seno I Project") involves the development of offshore crude oil and natural gas fields in the Makassar Strait Contract Area, East Kalimantan, Indonesia.  (Himburg Decl. ¶ 31; OPIC Ex. II at 24; SAC ¶ 191.)  The West Seno I Project consists of the "construction of a deep-water tension leg drilling platform, a floating production platform/barge, ... two oil and gas pipelines, and the drilling of approximately 20 production wells."  (Himburg Decl. ¶ 32; OPIC Ex. II at 24; SAC ¶ 192.)  The West Seno II Oil and Gas Project ("West Seno II Project") "will include the construction of a second deep-water tension leg drilling platform and the drilling of an additional 20+ production wells."  (Himburg Decl. ¶ 32; OPIC Ex. II at 24.)  OPIC designated each project as a Category A project and prepared a single environmental assessment under its environmental guidelines for the two projects.  (Himburg Decl. ¶ 36; OPIC Ex. II at 53.)  The total cost for the West Seno I Project is estimated at $550 million, and the total cost of the West Seno II Project is estimated at $253 million.  (OPIC Ex. II at 24.)

OPIC is involved with the West Seno I Project because it approved a $300 million loan guaranty to U.S. capital markets investors, but Mr. Himburg attests that the value of the guaranty is less than $10 million.  (Himburg Decl. ¶ 34; Supp. Himburg Decl. ¶ 12.)  The U.S. capital markets investors then loaned funds to a trust, which was created to fund the projects.  (*Id.*)  Although OPIC approved a $50 million loan guaranty for the development of the West Seno II Project, OPIC attests that it received a prospective notice of cancellation and will not be involved in that project if it goes forward.  (Himburg Decl. ¶ 35.)

OPIC's environmental assessment for the West Seno I and West Seno II Projects provides that "[b]ecause the project is considered sensitive, OPIC will require the submission of an annual self-monitoring report and a third party independent audit within the first three years of project commitment."  (OPIC Ex. II at 53.)  This environmental assessment also contains a number of recommendations, including OPIC's recommendation that certain provisions "should

13

United States District Court

For the Northern District of California

1  be included in the finance agreement." (*Id.*)[5]  Mr. Himburg also attests that the loan guaranty

2  requires the sponsor of the project, Union Oil Company of California, to "operate in accordance

3  with the applicable World Bank Group Standards for the Offshore Oil and Gas Industry,"

4  however a copy of the guaranty is not in the record.  (Himburg Decl. ¶ 36.)

5        **d.     Cantarell Oil Field Project.**

6        The Cantarell Oil Field Project ("Cantarell Project") is part of Mexico's largest oil field

7  "located in the Bay of Campeche off the coast of Yucatan."  (O'Boyle Decl. ¶ 35; SAC ¶ 173.)

8  Plaintiffs' specific challenge pertains to an enhancement of "an offshore petroleum complex,

9  owned and operated by Pemex (the Mexican national oil company)," which has been producing

10  oil since 1980.  (O'Boyle Decl. ¶¶ 35, 37; SAC ¶ 171.)  The enhancement project involved "the

11  installation of 56 new platforms of various sizes, modification and upgrade of 36 existing

12  platforms, laying of approximately 250 miles of new in-field pipelines, installation of an

13  extensive nitrogen injection system and drilling of over 218 new wells."  (O'Boyle Decl. ¶ 35.)

14        Ex-Im is involved in the Cantarell Project because it approved three guarantees for U.S.

15  exporters.  The exports consisted of "engineering, procurement and construction services and

16  major capital equipment supplied by Solar Turbine Inc., Steward & Stevenson, Baroid Drilling

17  Fluids, Bechtel International, Kellogg Brown and Root, and over 30 other U.S. companies."

18  (*Id.* ¶ 36; *see also* SAC ¶ 171.)  Ex-Im approved a total of $1,075,300 in guarantees between

19  1998 and 2001, and Ex-Im attests this amounts to "approximately one-third of the $3.3 billion

20  enhancement program costs."  (O'Boyle Decl. ¶ 37.)  The Administrative Record does not

21  include copies of the guarantees.  Ex-Im also attests it performed an environmental review of

22  the Cantarell Project, in accordance with its environmental guidelines.  (Supp. Mahoney Decl. ¶

23  6.)  The Administrative Record does not include Ex-Im's environmental review, but it does

24  include copies of the Engineering Evaluations.  Again, those Engineering Evaluations do not set

25  forth what conditions, if any, Ex-Im imposed on financing.  (*See, e.g.,* Ex-Im A.R. Tab 25 at 8,

26  Tab 26 at 5.)  Plaintiffs contend that approximately 40% of the oil from the Cantarell oil field

27  will be shipped to the United States.  (SAC ¶ 174.)

28

---

[5]      The majority of the recommendations are redacted.  (*See id.* at 53-54).

United States District Court

For the Northern District of California

1

**e.** **Hamaca Heavy Crude Oil Project**.

2      The Hamaca Heavy Crude Oil Project ("Hamaca Project") "involves the development of

3  reserves in the Hamaca area of the Orinoco basin in Eastern Venezuela, the construction of field

4  facilities and pipelines, and the construction of a simple refinery, referred to as the Upgrader, to

5  process the extra heavy crude to medium-weigh synthetic crude." (O'Boyle Decl. ¶ 40; *see also*

6  SAC ¶ 177.) Ex-Im provided a loan guaranty in the amount of $627.6 million to support U.S.

7  exports, including engineering, design, procurement and construction services for U.S.

8  companies. The Administrative Record does not include any of the terms of that guaranty. Ex-

9  Im claims that its support amounts to "approximately 14% of the total projects costs" of $4

10 billion. (*Id.* ¶¶ 40-41; Ex-Im A.R. Tab 25 at 4; SAC ¶¶ 177-78.) Assuming Ex-Im's figures are

11 correct, the Court calculates the actual percentage to be approximately 15.7%. Ms. O'Boyle

12 also states that the borrower informed Ex-Im that it did not require all of the funds that Ex-Im

13 was willing to guarantee. As such, Ex-Im's total financial support for the project amounted to

14 $573.6 million, or 14.3% of the total project costs. (*See* O'Boyle Decl. ¶ 42.)

15     Ex-Im attests it performed an environmental review of the Hamaca Project, in

16 accordance with its environmental guidelines and designated the project as a Category B

17 project. (Supp. Mahoney Decl. ¶ 6; Ex-Im A.R. Tab 25 at 4.) A copy of the full environmental

18 review is not part of the record, although an Engineering Evaluation for the project is included.

19 As with the other Engineering Evaluations submitted by Ex-Im, the Engineering Evaluation for

20 the Hamaca Project does not contain any conditions relating to financing and does not contain

21 any substantive analysis. (*See* Ex-Im A.R. Tab 25 at 4.) Plaintiffs contend that in general

22 "approximately 57% of Venezuelan oil is exported to the United States." (SAC ¶ 180.) Unlike

23 the Cantarell Project, Plaintiffs do not attribute the specific percentage of oil from the Hamaca

24 Project that will be shipped to the United States.

25

**f.** **Dezhou Coal-Fired Power Plant Project.**

26     The Dezhou Coal-Fired Power Plant Project ("Dezhou Project") is part of "an expansion

27 of the Shandong Huangeng Power Development Corporation's" coal-fired power station in the

28

15

1    Shandong province of China.  (O'Boyle Decl. ¶ 43; *see also* SAC ¶ 199.)  The total costs for the

2    expansion are estimated at $933 million.  (O'Boyle Decl. ¶ 44.)

3         Ex-Im is involved with this project because it approved a $76 million guaranty to

4    Citibank International plc, in connection with the export of steam turbines as well as related

5    goods and services that General Electric provided to the Dezhou Project.  (*Id.* ¶¶ 43-45; *see also*

6    SAC ¶¶ 199-200.)  According to Ms. O'Boyle, the Ex-Im loan guaranty represents 8.2% of the

7    total costs for the Dezhou Project, which also was financed with funds from other countries,

8    including Germany and China.  (O'Boyle Decl. ¶ 45.)  Ex-Im attests it performed an

9    environmental review of the Dezhou Project in accordance with the Ex-Im Guidelines.  (Supp.

10   Mahoney Decl. ¶ 6.)  The Administrative Record does not include the terms of the loan

11   guaranty and does not include a copy of Ex-Im's environmental review.

### 4.   The Defendants' Climate Change Reports.

13        In 2000, OPIC published a report that "evaluate[d] the cumulative climate implications

14   of all OPIC finance and political risk insurance projects since 1990," with respect to $CO_2$

15   emissions.[6]  (OPIC A.R. Tab 1 ("Climate Change: Assessing Our Actions" ("*Assessing Our*

16   *Actions*") at 6, 9); *see also id.* Tab 4 (OPIC's Annual Environmental Report for Fiscal Year

17   2002) at 000056).)  In *Assessing Our Actions*, OPIC stated that "while power projects have

18   considerable economic and social developmental benefits, they are also responsible for a

19   significant share of the anthropogenic emissions of [GHGs] ... that threaten the stability of the

20   global climate system."  (*Assessing Our Actions* at 7.)  OPIC also stated that "[t]he consumption

21   of fossil fuels, which provides electricity, heat and steam to the industrial, commercial and

22   residential sectors, and fuel to the transportation sector, is by far the largest contributor to global

23   [$CO_2$] emissions."  (*Id.*)  In addition, OPIC stated that "[t]here is a strong and growing scientific

24   consensus that these steady additions of GHGs have tipped a delicate balance and begun to

---

[6]    This report, dated October 2000, is listed on the index of OPIC's
Administrative Record as Tab 1.  OPIC only included the cover page in its Administrative
Record.  However, because Plaintiffs submitted the report as Exhibit 3 to their opposition to
Defendants' initial motion for summary judgment (*see* Docket No. 92), it has been made a
part of the record in this case, and the Court has considered it in its entirety.

*(Left margin: United States District Court — For the Northern District of California)*

United States District Court

For the Northern District of California

impact our climate and may be the dominant force driving recent warming trends." (*Id.*) OPIC also stated:

> Greenhouse gases generally persist for long periods in the atmosphere. While many conventional pollutants may persist in the atmosphere for only a matter of hours or days, many important GHGs persist for decades or even hundreds of years. For example, $CO_2$ has an estimated atmospheric persistence of 120 years and some [chloroflourocarbons] may persist for as long as 400 years. As a result, these gases accumulate, become very well mixed in the atmosphere and have a global impact that is mostly independent of where they were emitted. GHG persistence has significant policy implications because the gases we emit today may impact the climate system for hundreds of years.

(*Id.* at 22.) OPIC asserted that "[c]urrent $CO_2$ emissions from OPIC-supported projects represent approximately 0.24% of global $CO_2$ emissions," and concluded, however, that "OPIC-supported projects 'are *not* a major contributor to global greenhouse gas emissions or climate change.'" (*Id.* at 1, 5 (emphasis in original).)

In response to a report issued by FOE, among others, Ex-Im also prepared a report on its role in the production of GHGs. (Ex-Im A.R. Tab 1 ("Ex-Im's Role in Greenhouse Gas Emissions and Climate Change" (hereinafter "Ex-Im Report") at i).) Ex-Im's Report "only addressed [Ex-Im] projects that directly emit GHG." (*Id.*) Ex-Im did not address "equivalent $CO_2$ that results from extraction projects such as ... oil & gas productions, pipelines and oil refineries, all of which make fossil fuels to end users." (*Id.* at ii, 25 (providing reasons for excluding latter from report).)[7] Ex-Im concluded that "[t]he GHG production from Ex-Im Bank supported projects is not considered to be 'significant' with respect to the global environment." (*Id.*) In that report, Ex-Im also acknowledged that "GHG concentrations have indeed risen and that there is a reasonable likelihood that the increased concentration of these gases will result in increased average global temperatures during the coming decades." (*Id.* at 4.)

---

[7] Ex-Im stated that "examination of Ex-Im Bank supported oil and gas extraction projects and the equivalent emissions to be produced from these fuel sources may be useful from a policy perspective," and therefore included "a list of recently supported oil and gas sector projects (including pipelines) and the equivalent emissions expected from the burning of those products," in Appendix B to the report. (Ex-Im Report at 25.)

United States District Court

For the Northern District of California

1   According to the Ex-Im Report, "Ex-Im has supported $7.8 billion in exports to 86

2   projects in the fossil fuel power sector," which "produce (or will produce) ... 0.8% of the

3   predicted global production of $CO_2$ in 2001." Ex-Im also predicted that, with respect to projects

4   it supports, the "contribution to global $CO_2$ production will peak at 1.4% in year 2012." (Ex-Im

5   Report at ii; *see also id.* at 24-31 & App. C thereto.) Ex-Im concluded that the effect of Ex-Im

6   supported projects on climate change was insignificant. (*Id.* at 30-31.)

7   Plaintiffs dispute these conclusions and argue that Defendants failed to account for

8   indirect GHG omissions. Further, Plaintiffs assert that GHG emissions from projects financed

9   by OPIC and Ex-Im amount to 7.3% of annual world wide emissions, and they argue that

10   Defendants' calculations do not account accurately for all indirect emissions and do not include

11   estimates of all direct emissions. (Plaintiffs' Ex. 1 (Supplemental Declaration of Richard Heede

12   (hereinafter "Heede Supp. Decl.") ¶¶ 4, 11-13 & Att. A).)

13   **III.    ANALYSIS.**

14   **A.    Legal Standards Applicable to Motions for Summary Judgment.**

15   Summary judgment is proper when the "pleadings, depositions, answers to

16   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

17   genuine issue as to any material fact and that the moving party is entitled to judgment as a

18   matter of law." Fed. R. Civ. P. 56(c). A principal purpose of the summary judgment procedure

19   is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S.

20   317, 323-24 (1986). "In considering a motion for summary judgment, the court may not weigh

21   the evidence or make credibility determinations, and is required to draw all inferences in a light

22   most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.

23   1997).

24   The party moving for summary judgment bears the initial burden of identifying those

25   portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

26   issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this initial

27   burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth

28   specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The

non-moving party must "identify with reasonable particularity the evidence that precludes

summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v.

Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district court's task

to "scour the record in search of a genuine issue of triable fact").  If the non-moving party fails

to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477

U.S. at 323.  The Court must evaluate each party's motion on its own merits.  *See, e.g., Fair

Housing Council of Riverside Co., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

### B.     NEPA Requirements.[8]

NEPA "establishes a 'national policy [to] encourage productive and enjoyable harmony

between man and his environment,' and was intended to reduce or eliminate environmental

damage and to promote 'the understanding of the ecological systems and natural resources

important to' the United States." *Department of Transportation v. Public Citizen*, 541 U.S. 752,

756 (2004) (quoting 42 U.S.C. § 4321) (hereinafter "*Public Citizen*").  NEPA does not mandate

particular results.  Rather "it imposes only procedural requirements on federal agencies with a

particular focus on requiring agencies to undertake analyses of the environmental impact of

their proposals and actions." *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S.

332, 349-51 (1989)).

> At the heart of NEPA is a requirement that federal agencies
> "include in every recommendation or report on proposals for legislation
> and other major Federal actions significantly affecting the quality of the
> human environment, a detailed statement by the responsible official on -
> (i) the environmental impact of the proposed action, (ii) any adverse
> environmental effects which cannot be avoided should the proposal be
> implemented, (iii) alternatives to the proposed action, (iv) the relationship
> between local short-term uses of man's environment and the maintenance
> and enhancement of long-term productivity, and (v) any irreversible and
> irretrievable commitments of resources which would be involved in the
> proposed action should it be implemented." 42 U.S.C. § 4332(2)(c).

> This detailed statement is called an Environmental Impact
> Statement (EIS).  The Council of Environmental Quality (CEQ),
> established by NEPA with authority to issue regulations interpreting it,
> has promulgated regulations to guide federal agencies in determining what
> actions are subject to that statutory requirement. ... The CEQ regulations

---

[8]     NEPA does not contain a separate provision for judicial review and, thus, an
agency's compliance with NEPA is reviewed under the APA.  *Ka Makani 'O Kohala Ohana,
Inc. v. Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002) (hereinafter "*Ka Makani*").

**United States District Court**
For the Northern District of California

allow an agency to prepare a more limited document, an Environmental Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS.

*Public Citizen*, 541 U.S. at 757-58 (citations omitted); *see also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (hereinafter "*High Sierra*") ("As a preliminary step, the agency may prepare an [EA] to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS.").  Thus, as the Supreme Court stated in the *Robertson* case, "[o]ther statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action."  *Robertson*, 490 U.S. at 351.

When it determines whether to prepare an EIS, a federal agency shall:

(a) Determine under its procedures supplementing these regulations ... whether the proposal is one which:

> (1) Normally requires an environmental impact statement; or
> (2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment ... The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process ..., if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact ..., if the agency determines on the basis of the environmental assessment whether or not to prepare a statement. ...

40 C.F.R. § 1501.4(a)-(e).

In general, an agency's decision not to prepare an EA or EIS can be set aside "only upon a showing that [the decision] was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Public Citizen*, 541 U.S. at 763 (quoting 5 U.S.C. § 706(2)(A)); *see also Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 961-62 (9th Cir. 2006) (hereinafter "*Great Basin*").  However, the Ninth Circuit has held that when, without conducting an EA, an

United States District Court

For the Northern District of California

agency decides that a project does not require the preparation of an EIS, the agency's decision is reviewed under a reasonableness standard. *High Sierra*, 390 F.3d at 640 (citing, *inter alia*, *Ka Makani*, 295 F.3d at 959 n.3). In such a case, a court "will defer to an agency's decision only if it is 'fully informed and well considered.'" *Id.* (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988)). If an agency has taken action without observing procedure that is required by law, a court must also set that action aside. *Id.*

When a court applies the "arbitrary and capricious" standard, it must "'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' ... [Courts] must also ensure that the agency 'took a hard look at the environmental consequences of its action.'" *Great Basin*, 456 F.3d at 962 (citations omitted). A court may reverse an agency decision under the arbitrary and capricious standard "only if the agency has relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered 'an explanation [for its decision] that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir. 2003) (noting standard), *amended by* 352 F.3d 1186 (9th Cir. 2003) (brackets in original)).

"The standard for determining whether the implementation of a proposal would significantly affect the human environment," and thereby trigger the need to prepare an EIS, "is whether 'the plaintiff has alleged facts which, if true, show that the proposed project may significantly degrade some human environmental factor.'" *Foundation for North American Wild Sheep v. USDA*, 681 F.2d 1172, 1177-78 (9th Cir. 1982) (hereinafter "*Wild Sheep*") (quoting *Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 597 (9th Cir. 1981)). The plaintiff need not show that significant effects will in fact occur*,* but if the plaintiff raises substantial questions about whether a project may have a significant effect, an EIS must be prepared. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (hereinafter "*Blue Mountains*") (citing *Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1150 (9th Cir. 1998)); *Wild Sheep*, 671 F.2d at 1178.

1      Finally, "[n]either the language nor the history of NEPA suggest that it was intended to

2  give citizens a general opportunity to air their policy objections to proposed federal actions.

3  The political process, and not NEPA, provides the appropriate forum in which to air policy

4  disagreements."[9]  *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766,

5  777 (1983).

6      **C.**    **OPIC Has Not Established That It Is Not Exempt From NEPA's Requirements.**

7

8      In its August 23 Order, the Court addressed OPIC's argument that the environmental

9  procedures in OPIC's organic statute displaced NEPA.  (August 23 Order at 11:17-13:11.)

10  When it determined that OPIC had not put forth evidence that Congress acceded to OPIC's

11  interpretation of its organic statute, the Court implicitly rejected OPIC's arguments regarding

12  the plain language of that statute.  In the August 23 Order, the Court also discussed *Merrell v.*

13  *Thomas*, 807 F.2d 776 (9th Cir. 1986) and *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir.

14  1995) and rejected OPIC's argument that the legislative history of OPIC's organic statute

15  "evinces the same Congressional intent to displace NEPA as in *Merrell* and *Douglas County*."

16  (August 23 Order at 13:2-3.)  The basis for the Court's conclusion was that "[c]onspicuously

17  absent from the record is any evidence that Congress amended OPIC's [organic] statute *after*

18  OPIC interpreted its statute to displace NEPA."  (August 23 Order at 13:6-7 (emphasis in

19  original).)[10]

20

---

21      [9]    There are references in Defendants' respective Administrative Records that

22  suggest this litigation really is a policy dispute between Plaintiffs and Defendants about the nature of the projects the Defendants support.  (*See, e.g.,* OPIC A.R. Tab 14 at 3723, 3731, 3743, 3745, 3781-85, 3786-3801; Ex-Im A.R. Tab 9.)

23

24      [10]    In its first motion for summary judgment, OPIC attempted to support its position that NEPA does not apply to it by relying on legislative history relating to amendments to 22 U.S.C. § 2151p ("Section 2151p").  In 1985 OPIC's organic statute was

25  amended to apply the provisions of Section 2151p to OPIC.  *See* 22 U.S.C. § 2191(g).  (*See also* OPIC Ex. 10, Excerpt from House Conference Report on P.L. 99-204 ("The House

26  amendment applies to OPIC projects the environment and natural resource standards and considerations now applicable to AID projects....").  OPIC renewed that argument in the

27  instant motion, and the Court has determined that it would not revisit this issue.  (*See* Order Granting in Part and Denying in Part Plaintiffs' Motion to Strike.)  However, to the extent

28  the Court did not make explicit the reason it found OPIC's argument unpersuasive in its August 23 Order, it provides that reasoning herein.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    In the instant motion, OPIC submits additional evidence, Exhibits 1A-1DD and 1FF, to

2    support its argument on this point.  Some of this evidence consists of internal OPIC documents

3    or other materials that contain statements either about OPIC's belief that it is not subject to

4    NEPA or are silent on the issue.  The Court finds that these exhibits do not establish as a matter

5    of law that Congress was aware of and acceded to OPIC's position.  (*See, e.g.,* OPIC Exs. 1C,

6    1G, 1L, 1N, 1BB, 1 EE; *see also* OPIC A.R. Tab 14 at 3968.)  Other exhibits apparently were

7    sent to individual members of Congress but these exhibits do not support an inference that

8    OPIC's views were communicated to Congress as a whole.  (*See, e.g.,* Exs. 1M, 1DD.)  Again,

9    the Court finds these exhibits to be immaterial to determining the issue of whether Congress

10    was aware of and acceded to OPIC's view that it is not subject to NEPA.

11    OPIC also submits exhibits that reflect OPIC's belief that none of its projects triggered

12    NEPA's requirements, because the projects were located overseas, OPIC did not control them,

13    and the projects did not affect the domestic environment.  (*See, e.g.* OPIC Ex. 1F ("OPIC has no

14    projects of its own"), 1H ("OPIC's programs are operated solely within an international context

---

16    Section 2151p sets forth the environmental requirements applicable to the US AID.
The legislative history on which OPIC relied contains debate about removing a reference to

17    NEPA from 22 U.S.C. § 2151p.     This legislative history also suggests that US AID did not
perform environmental impact statements "under the precise terms of" NEPA.  (*See* OPIC

18    Ex. 11 ("We do impact statements, but not under the precise terms of [NEPA].  What we
want to avoid is a hooking into that act and all of the procedures it requires because we

19    believe for some projects it would make the time period and the development of the project,
including the environmental assessment, the environmental impact – if that is required – just

20    too long.").

21    The debate on which OPIC relied occurred well before Section 2151p was made
applicable to OPIC.  Further, US AID *is* required to comply with NEPA in appropriate

22    circumstances.  *See* 22 C.F.R. § 216.1(a) (stating that purpose of regulations is to implement
the requirements of NEPA as they effect the US AID program); 44 Fed. Reg. 56378

23    (proposed amendments to US AID regulations); 45 Fed. Reg. 70239 (discussing amended
regulations and noting that US AID had agreed that as a matter of law, NEPA applied to its

24    projects that significantly affected the domestic environment); *Environmental Defense Fund
v. US AID*, 6 Env. L. Rptr. 20121 (Dec. 5, 1975) (Order approving stipulation wherein US

25    AID agreed to "propose, solicit and consider public comments on, and adopt environmental
regulations, to assist AID in implementing the requirements of NEPA").  In addition, US

26    AID's environmental regulations state that the terms "environment" and "significant effect"
have the same meaning as in CEQ's NEPA regulations and also state that when US AID

27    prepares an EIS, it "will generally follow the CEQ regulations, but will take into account the
special considerations and concerns of" US AID.  22 C.F.R. § 216.7(b)-(c).  Accordingly, the

28    Court concluded that this legislative history did not establish as a matter of law that OPIC is
not subject to NEPA.

and are not 'federal actions' within the meaning of NEPA, since OPIC has no projects of its own, but merely gives assistance to projects within developing countries."), Ex. 1I ("Since OPIC does not conduct federal actions having effects on the environment within the United States, OPIC activities do not give rise to the domestic application of NEPA."); *see also* 1V, 1W, 1Y.)  These exhibits, however, do not imply that OPIC adopted the position that it is never required to comply with NEPA, and the Court finds them immaterial to the issue of whether Congress was aware of and acceded to OPIC's view that it is not subject to NEPA.

OPIC also relies on the fact that it published versions of its environmental handbook in the Federal Register in 1997 and 1998 to evidence the fact that Congress was aware of and acceded to its views.  *See, e.g.,* 62 Fed. Reg. 5645-01 at *5645 (Feb. 6, 1997); 63 Fed. Reg. 9696-01 at *9697 (Feb. 25, 1998).  OPIC argues that these proposed handbooks do not reference NEPA as authority for its environmental procedures and, thus, would have signaled to Congress OPIC's position that it is not subject to NEPA.  OPIC also submits correspondence between its staff and Speaker of the House Nancy Pelosi and members of her staff, regarding her comments on the environmental procedures set forth in drafts of the OPIC Handbook.[11] (*See* Exhibits 1O - 1S, 1FF.)  However, none of this correspondence reflects OPIC's belief that it is not subject to NEPA.  Rather, most of the correspondence pertains to Speaker Pelosi's concern that OPIC maintain transparency during the approval process and to her concern that the timing allowed for public comment on OPIC projects was insufficient.  This correspondence cannot be read to suggest that Speaker Pelosi, let alone all members of Congress, acquiesced in OPIC's view that it is not subject to NEPA.  (*See also* Plaintiffs' Reply Ex. 5 (Letter from Speaker Pelosi to OPIC President Mosbacher).)

OPIC also relies on its Exhibit 1M and its Exhibit 5 in support of its position that Congress was aware of, and acceded to, its view that it is not subject to NEPA.  OPIC Exhibit 5 is a copy of a proposed amendment to NEPA that would have required agencies to give "full consideration of the environmental impacts of their actions on the oceans, the atmosphere, and

---

[11]     The correspondence between OPIC and Speaker Pelosi predates her tenure as Speaker of the House.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    other geographic areas *outside the jurisdiction* of the United States, its territories, and its

2    possessions." (OPIC Ex. 5 at 5 (emphasis added).) OPIC Exhibit M sets forth OPIC's

3    objections to the proposed legislation. Those objections do not include an assertion that OPIC

4    is not subject to NEPA. Rather, OPIC argued that the proposed legislation would be redundant

5    because OPIC already was required to consider the impact of its projects on the global

6    commons, *i.e.* areas outside the jurisdiction of the United States, by virtue of Executive Order

7    12114 and its own organic statute. (*See* OPIC Ex. 1M.)

8        Finally, OPIC submits two documents prepared by the General Accounting Office

9    ("GAO") entitled "1985 Reference Manual of Corporations Authorized or Established by

10    Congress" ("1985 Reference Manual") and "Profiles of Existing Government Corporations

11    ("1988 Report")." (OPIC Exs. 3, 4.) OPIC contends that these documents were submitted to

12    Congress before OPIC's organic statute was amended in 1985 and again in 1988. The 1985

13    Reference Manual provides that the "manual contains legal, financial, and other information on

14    44 corporations authorized or established by the Congress," and "cites federal laws the

15    corporations consider themselves subject to, or, if they are not, whether these legal requirements

16    have been administratively adopted." (OPIC Ex. 3, Preface.) The 1985 Reference Manual

17    purportedly was prepared "in response to a request from the Chairman of the House

18    Government Operations Committee," for the purpose of assisting "the Committee in its study of

19    the need to revise basic corporate control laws." (*Id.* & at 2.) Similarly, the 1988 Report

20    purportedly was prepared to assist the Government Operations Committee "in fulfilling its

21    oversight responsibilities." (OPIC Ex. 4, Preface.)

22        Each of the corporations identified in the reports were asked to provide "their views as

23    to whether they are subject to various federal laws, and if not, whether the corporations have

24    administratively adopted legal requirements contained in these laws." (OPIC Ex. 3 at 4; *see*

25    *also* OPIC Ex. 4, Preface.) In each of the reports, OPIC stated that it is "[n]ot subject to and did

26    not administratively adopt [NEPA's] requirements." (OPIC Ex. 3 at Att. II at 1, Ex. 4 at 236,

27    248.) The 1985 Reference Manual summarizes each corporation's response, but it does not

28    include the actual responses provided by each corporation. (Ex. 3 at 4.)

25

United States District Court

For the Northern District of California

1    OPIC argues that because Congress had these reports, it knew OPIC believed it is not

2   subject to NEPA.  Thus, OPIC argues, because Congress did not amend OPIC's organic statute

3   after receiving these reports, to expressly state that NEPA is applicable to OPIC, Congress

4   acceded to the view that NEPA does not apply to OPIC.  The 1985 Report is undated and, thus,

5   the Court cannot determine whether it was presented to the Government Operations Committee,

6   let alone the entire Congress, before or after the 1985 amendments to OPIC's organic statute.

7   In contrast, the 1988 Report is dated December 1988 and its preface makes reference to the fact

8   that it was "released to serve as a reference document for our congressional colleagues."  (OPIC

9   Ex. 4, Preface.)  The 1988 Report better supports OPIC's position but absent from the record is

10   OPIC's response to the questionnaire, which would articulate the rationale for OPIC's views.

11    The Court has considered the new evidence submitted by OPIC and concludes that it

12   does not, as a matter of law, establish that Congress was aware of OPIC's view that it is not

13   subject to NEPA and that Congress acquiesced in that view.  Accordingly, the Court finds no

14   reason to revisit its conclusions on the applicability of the *Merrell* and *Douglas County* cases to

15   the instant litigation.  OPIC's cross-motion is DENIED to the extent it rests on this argument.

16   The Court assumes for the remainder of this Order, that OPIC is subject to NEPA.

17    **D.    Plaintiffs' Claims Do Not Involve Extraterritorial Application of NEPA.**

18    Ex-Im and OPIC argue that this Court must grant judgment in their favor because

19   Plaintiffs improperly seek to apply NEPA to projects that are located in foreign countries.[12]

20   Plaintiffs, however, make clear that they seek to apply NEPA because the projects that

21   Defendants support purportedly significantly affect the *domestic* environment.  In addition,

22   Defendants do not claim that the decisions about whether or not to support such projects occur

23   abroad.  *Cf. Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528, 532-33 (D.C. Cir.

24   1993) (rejecting extraterritoriality argument with respect to actions impacting Antarctica on the

25   grounds that decision making occurred within the United States and because NEPA imposed no

27   [12]    Unlike OPIC, Ex-Im does not dispute that it may be subject to NEPA, and it
28   has adopted supplementing regulations to implement NEPA "in the relatively rare cases
where [Ex-Im] financing of U.S. exports may affect environmental quality in the United
States, its territories or possessions."  12 C.F.R. § 408.3.

1   substantive requirements that could be interpreted to govern conduct abroad).  Finally,

2   notwithstanding Defendants' arguments regarding foreign policy relations, there is evidence to

3   suggest that the Defendants may have control over the manner in which these projects operate.

4   *See* Section III.E.3, *infra*.  As such, Defendants' arguments appear to be better directed to

5   whether Plaintiffs can establish the requisite causation.  The Court DENIES Defendants'

6   motions to the extent they are premised on the extraterritoriality argument.

       **E.**      **Major Federal Actions.**

8         "Under NEPA, an agency is required to provide an EIS only if it will be undertaking a

9   'major federal actio[n],' which 'significantly affect[s] the quality of the human environment.'"

10  *Public Citizen*, 541 U.S. at 763; *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 859 (D.D.C.

11  1991) (stating that the CEQ regulations "require a federal agency proposing major federal

12  action that does not have a significant impact on the environment to file an [EA] that explains

13  how the agency reached that conclusion") (citing 40 C.F.R. § 1508.13)).

14        "'Major Federal action' is defined to 'includ[e] actions with effects that may be major

15  and which are potentially subject to Federal control and responsibility."  *Public Citizen,* 541

16  U.S. at 763-64 (quoting 40 C.F.R. § 1508.18).  NEPA's implementing regulations further

17  explain the meaning of major federal actions and state that "[m]ajor reinforces but does not

18  have a meaning independent of significant (§ 1508.27)."  40 C.F.R. § 1508.18.  "Actions" may

19  "include new and continuing activities, including projects and programs entirely or partly

20  financed, assisted, conducted, regulated or approved by federal agencies ... ."  *Id.* § 1508.18(a).

21  Major federal actions also include the "[a]pproval of specific projects, such as construction or

22  management activities located in a defined geographic area."  40 C.F.R. § 1508.18(b)(4).

23  Finally, the "[a]doption of programs, such as a group of concerted actions to implement a

24  specific policy or plan; systematic and connected agency decisions allocating agency resources

25  to implement a specific statutory program or executive directive," can qualify as a major federal

26  action under NEPA.  40 C.F.R. § 1508.18(b)(3) (emphasis added).

     **1.**      **The Court Is Not Precluded From Considering The Major Federal
             Action Argument.**

United States District Court

For the Northern District of California

1    It is undisputed that neither Ex-Im nor OPIC prepared either an EA or an EIS under the

2 auspices of NEPA for any of the projects identified in the SAC. OPIC and Ex-Im contend that

3 none of the projects identified in the SAC or in the Administrative Record qualify as a "major

4 federal action." (*See* OPIC Cross-Motion at 25; Ex-Im Cross-Motion at 11.) Plaintiffs argue

5 that this argument is a *post hoc* rationale, because Defendants did not argue that their projects

6 are not major federal actions in their climate change reports. Because Plaintiffs attempt to

7 equate Defendants' climate change reports to FONSIs under NEPA, they argue that the Court

8 can look only to the rationale set forth therein, namely that Defendants believed that the projects

9 they support have an insignificant impact on global warming. (*See* Plaintiffs' Opp. at 3:15-

10 4:10.)

11    "The rule barring consideration of *post hoc* agency rationalizations operates where an

12 agency has provided a particular justification for a determination at the time the determination

13 is made, but provides a different justification for that same determination when it is later

14 reviewed by another body." *Independence Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 511 (9th

15 Cir. 1997) (citing *Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607,

16 631 n.31 (1980) and *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). As the Ninth Circuit

17 noted in *Independence Mining*, "this rule has been developed in the context of a court's duty to

18 set aside a 'final agency decision' if based on a *post hoc* rationalization. Such a 'final agency

19 decision,' ... provides the court with a date certain by which by which it can analyze the

20 agency's justifications." *Id.*

21    In this case, however, Plaintiffs are proceeding in part under 5 U.S.C. § 706(1) and

22 contend that Defendants have never complied with NEPA. Defendants raise the major federal

23 action argument in support of their position that they were not required to comply with NEPA

24 in the first instance. Accordingly, the Court concludes that the rule against *post hoc*

25 rationalizations does not apply here.[13]

26

27    [13]   At oral argument, Plaintiffs stated that they ask for a declaration that each
Defendant's conclusion about the "insignificance" of their actions is contrary to law. (*See*
28 April 14, 2006 Transcript ("Tr.") at 90-91.) Because Plaintiffs contend that Defendants
never complied with NEPA, the Court cannot equate the climate change reports with NEPA

United States District Court

For the Northern District of California

1

2              **2.      Defendants Do Not Have Energy "Programs."**

3        Plaintiffs contend that each of the Defendants operate an energy program and that this

4  program is a "major federal action" for purposes of NEPA.  In moving for summary judgment,

5  Plaintiffs refer the Court only to Ex-Im Annual Reports and to OPIC's "Program" Pamphlet.

6  (*See* Ex-Im A.R. Tabs 3-6; OPIC A.R. Tab 3.)  With their opposition to Defendants' cross-

7  motions, however, Plaintiffs submit a document, dated May 2001, that is entitled "National

8  Energy Policy: Report of the National Energy Policy Development Group" ("National Energy

9  Policy").  (*See* Plaintiffs' Opp., Ex. 4.)  Plaintiffs argue that this evidence establishes that

10  Defendants have energy programs, which qualify as major federal actions, and that these

11  programs require a programmatic EIS under NEPA.

12        In order to establish that Defendants have a "program" for NEPA purposes, Plaintiffs

13  must demonstrate that Defendants have engaged in "a *group of concerted actions* to implement

14  a *specific* policy or plan" or have made "*systematic and connected agency decisions* allocating

15  agency resources to implement a *specific* statutory program or executive directive."  40 C.F.R. §

16  1508.18(b)(3) (emphasis added).  This they have not done.  With the exception of the National

17  Energy Policy, Plaintiffs do not support their motion with a citation to any such statutory

18  program, executive directive, plan or policy.   As to Ex-Im, the Annual Reports cited by

19  Plaintiffs merely document the total amount of funding Ex-Im provided to energy projects.

20  They do not establish that Ex-Im chose to finance these projects pursuant to a specific

21  "statutory program or executive directive" or to a "specific policy or plan."  Plaintiffs' reference

22  to Ex-Im's statement that it is a "key player" in implementation of policy, as set forth in its

23  2002 Annual Report, refers to Ex-Im's role in U.S. trade strategy in general and not to the

24  National Energy Policy.  (*See* Ex-Im A.R. Tab 6 at 3.)  Further, Ms. O'Boyle, who is Ex-Im's

25  Vice President of the Structured Financing Division, attests that Ex-Im's business is driven by

26  market demand and that it "makes no effort to focus its support on any particular type of

27  ──────────────────

28  FONSIs, and the Court DENIES Plaintiffs' motion to the extent they base their claims on
conclusions set forth in Defendants climate change reports.

industry." (O'Boyle Decl. ¶¶ 1, 13-20, 26-30.)  Nor does Ex-Im set any "limits or goals for any particular type of transaction, export or country, other than the statutory goal of 20% for direct support of small business export transactions."  (*Id.* ¶ 17.)

As to OPIC, it admits that it has a "power portfolio," and *Assessing Our Actions* is a voluntary assessment of that portfolio.  (*See* OPIC A.R. Tab 17 at 4382.)  In the context of investments, a "portfolio" is "the collective term for all the securities (which may consist of various types) held by one person or institution."  *See, e.g.,* Blacks Law Dictionary at 1162 (6th Ed. 1990)).  The fact that OPIC may have what it describes as a "power portfolio" does not establish that it has created that portfolio pursuant to a "group of concerted actions to implement a specific policy or plan" or pursuant to "systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18(b)(3).  Mr. Himburg also attests that OPIC does not have a formal energy program and that its support of projects abroad is "reactive in nature and depend[s] upon the interest of eligible U.S. investors and other sponsors of development activities engaging in business in markets in which political and associated commercial risks are perceived to be great."  (Himburg Decl. ¶¶ 6-10, 12-17.)

Nor does OPIC's Program Handbook establish that OPIC has a "program" to support energy projects.  OPIC does state therein that it "has a comprehensive insurance program to encourage petroleum exploration, development, and production in developing countries." (OPIC A.R. Tab 3 at 11.)  However, Mr. Himburg explains that the "insurance program" discussed in the pamphlet is offered "to address the special needs of investors" in the oil and gas field.  (*Id.* ¶ 14.)

Finally, although Defendants approved the Hamaca, Cantarell, Chad-Cameroon and West Seno Projects in 2001 and 2002, after the National Energy Policy Report was released, it would be pure speculation to find that this timing alone, without more, demonstrated that the Defendants took these actions "pursuant to" that policy.  The Court concludes that Plaintiffs have not demonstrated that either Ex-Im or OPIC has an energy "program" as that term is understood in NEPA parlance.

1    The Court finds support for this conclusion in *Foundation on Economic Trends v. Lyng*,

2    817 F.2d 882 (D.C. Cir. 1987) (hereinafter "*Lyng*").  In that case, the court held that the

3    USDA's research "program" on animal productivity research was not a "program" requiring a

4    programmatic EIS under NEPA.  The court noted that the research projects conducted under the

5    auspices of the "program" were extremely broad and diverse in their in scope, and they also

6    were "discrete and independent in nature."  *Lyng*, 817 F.2d at 885.  Given those facts, the court

7    concluded that even though the research was conducted pursuant to an underlying USDA

8    policy, "[t]he CEQ guidelines, require more: the agency's actions must be 'concerted' or

9    'systematic and connected,'" and found the plaintiffs had not established that the research was

10   concerted or connected.  *Id.*

11   Here too the record establishes that each Defendant finances energy projects in varied

12   and scattered foreign locales, that these projects are not dependent upon one another, and that

13   the approval of any given project does not necessarily insure that another power project will be

14   approved in the future.  *See id.; see also Watkins*, 808 F. Supp. at 863 (concluding that

15   programmatic EIS was not required where two programs served "same non-proliferation policy

16   goals" because a common objective was insufficient to establish the need for a programmatic

17   EIS).  In sum, the Court concludes that OPIC and Ex-Im have neither adopted "a group of

18   concerted actions to implement a specific policy or plan" nor engaged in "systematic and

19   connected agency decisions allocating agency resources to implement a specific statutory

20   program or executive directive."  *See* 40 C.F.R. § 1508.18(b)(3).

21   Accordingly, Plaintiffs are not entitled to a declaration that Defendants have energy

22   programs that require a programmatic analysis under NEPA, and Plaintiffs' motion is DENIED.

23   Defendants' cross-motions are GRANTED IN PART on this basis.

24       **3.      The Court Cannot Determine As A Matter of Law Whether
                    Individual Projects Are Major Federal Actions.**

25       **a.      Projects identified in the SAC.**

26

27   Plaintiffs argue that each of the projects identified in the SAC qualify as major federal

28   actions.  This argument is based upon the amount of financing Defendants provide to the

1    projects, as well as the fact that Defendants' environmental guidelines provide that Defendants

2    may impose environmental conditions in connection with financing.  (*See, e.g.,* Plaintiffs' Mot.

3    at 9:13-13:22.)  In essence, Plaintiffs argue that the level of financing Defendants' provide is so

4    great that these projects are dependent upon the financing to go forward.  The Defendants assert

5    this is not so.[14]

6            In some instances, "significant federal funding can turn what would otherwise be a state

7    or local project into a major federal action."  *Ka Makani*, 295 F.3d at 960 (quoting *Alaska v.*

8    *Andrus*, 591 F.2d 537, 540 (9th Cir. 1979) and *Almond Hill Sch. v. USDA*, 768 F.2d 1030, 1039

9    (9th Cir. 1985)) (internal quotation marks omitted).  Where, as here, non-federal actors are

10   involved, "'[t]here are no clear standards for defining the point at which federal participation

11   transforms a state or local project into a major federal action.' ... 'The matter is simply one of

12   degree.'"  *Ka Makani*, 295 F.3d at 960 (quoting *Almond Hill*, 768 F.2d at 1039 and omitting

13   citations)).  Thus, to determine whether a particular project qualifies as a major federal action

14   for NEPA purposes, a court should consider both the nature of the federal funds used and the

15   extent of federal involvement.  *Id.* (quoting *Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (9th

16   Cir. 1988)).  This is because "[t]he purpose of NEPA is to 'bring environmental considerations

17   to the attention of federal decision makers.'"  *Id.* (quoting *Friends of the Earth v. Coleman*, 518

18   F.2d 323, 329 (9th Cir. 1975) (emphasis omitted).

19           It is undisputed that Ex-Im approved a $200 million loan guaranty in connection with

20   the Chad-Cameroon Project, loan guarantees in the amount of $847.6 million, $400 million, and

21   $300 million in connection with the Cantarell Project, a $627 million loan guaranty in

22   connection with the Hamaca Project, and a $76 million loan guaranty in connection with the

23

24           [14]     Ex-Im also asserts that "all of the projects described in Plaintiffs' [SAC] are
     for guarantees," which "normally do not require EAs or EISs."  (Ex-Im's Cross-Motion for
25   Summary Judgment and Opposition ("Ex-Im Br.") at 6-7 (citing, *inter alia*, 12 C.F.R. §
     408.6, 40 C.F.R. § 1508.4, and O'Boyle Decl., ¶¶ 33, 37, 41, 44-45).)  Plaintiffs assert that
26   this is another *post hoc* rationale that cannot be considered by the Court.  Although the Court
     could consider this argument, in light of the fact that Plaintiffs argue Ex-Im never complied
27   with NEPA, Ex-Im has not provided a sufficient basis for the Court to conclude that the
     decision to categorically exclude guarantees from NEPA coverage would be reasonable.
28   Accordingly, Ex-Im's motion is DENIED to the extent it rests on this argument, and the
     Court shall not revisit this issue.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   Dezhou Project.  (Plaintiffs' Mot. at 10-11; O'Boyle Decl. ¶¶ 33, 37, 41, 44-45; SAC ¶¶ 163,

2   171, 177, 199; Answer ¶¶ 163, 171.)  Ex-Im attests that its $200 million loan guaranty for the

3   Chad-Cameroon Project was 9.1% of the $2.2 billion cost for the transportation system.

4   (O'Boyle Decl. ¶ 33.)  Ex-Im also attests that the loan guarantees it issued with respect to the

5   Hamaca Project and the Dezhou Project represent 14% and 8.2%, respectively, of the total costs

6   of the projects.  (O'Boyle Decl. ¶¶ 40-47.)  In contrast to these projects, Ex-Im attests that, with

7   respect to the Cantarell Project, it provided loan guarantees representing "approximately one-

8   third of the $3.3 billion enhancement program costs."  (*Id.* ¶ 37.)

9        It is also undisputed that OPIC provided a $250 million loan guaranty in connection

10  with the Chad-Cameroon Project, a $116 million loan guaranty in connection with the Sakhalin

11  Project, and a loan guaranty of $350 million in connection with the West Seno I Project.

12  (Plaintiffs' Mot. at 13; Himburg Decl. ¶¶ 22, 26, 34; SAC ¶¶ 165, 182, 189, 190; Answer ¶¶

13  165, 182, 189, 190.)[15]  OPIC attests that the total cost of the Chad-Cameroon Project is

14  estimated to be $3.5 billion, which, according to OPIC, is approximately 350 times greater than

15  the annual value of the contract for the U.S. investor participating in the contract.  (Supp.

16  Himburg Decl. ¶¶ 3-6.)  OPIC also attests that the value of its $116 million loan guaranty for

17  the Sakhalin Project is less than $20 million and attests that the total cost of that project is

18  estimated to be $1.5 billion.  (*Id.* ¶¶ 7-10.)  OPIC attests that this is "12 times more than the

19  maximum possible payout under OPIC's original loan guaranty and 75 times greater than the

20  actual value of the guarantee for the private U.S. investors participating in the project."  (*Id.* ¶

21  9.)  As to the West Seno I Project, Mr. Himburg attests that the value of its $300 million loan

22  guaranty is only $10 million, but provides no basis for that statement, and he attests that the

23  total costs of that project were estimated to be $550 million.  (*Id.* ¶¶ 11-12.)

24       If the Court were to look only at the level of financing Defendants provide, the Court

25  cannot say whether the financing Defendants provided in connection with the Chad-Cameroon,

26  Hamaca, Dezhou, and Sakhalin Projects would be sufficient to render the projects major federal

27

28       [15]   OPIC no longer has any financial obligations with respect to the Sakhalin
    Project and the West Seno I Project.  (*See* Declaration of Caroline M. Tunison filed in
    support of Defendants' Notice of Changed Factual Circumstances.)

United States District Court

For the Northern District of California

actions for purposes of NEPA. *See Ka Makani*, 295 F.3d at 960; *Coleman*, 518 F.2d at 329 (finding that state funded projects did not constitute major federal action where federal contributions to other related development projects "amount[ed] to less than 10% of the total expenditures"). With respect to the West Seno I and Cantarell Projects, the Court cannot say that the financial support provided by OPIC and Ex-Im, respectively, is marginal. *See Sierra Club v. United States Fish and Wildlife Serv.*, 235 F. Supp. 2d 1109 (D. Ore. 2002) (federal funding that amounted to 75% of project costs "probably" sufficient to federalize project) (hereinafter "*Fish and Wildlife*"). The Court, however, also must consider the nature of Defendants involvement in each these seven projects. *Ka Makani*, 295 F.3d at 960.

In *Ka Makani*, the plaintiff sought to enjoin work on a water diversion system until the Department of Housing and Urban Development ("HUD") and the United States Geological Survey ("USGS") prepared an EIS under NEPA. *Ka Makani*, 295 F.3d at 957. USGS was involved in the projects because it provided "partial funding of and participat[ed] in a series of preliminary studies designed to assess the groundwater availability in the basal aquifer of the North Kohala area and a program of test drilling and test pumping in the aquifer." *Id.* at 958. In total, USGS provided approximately $800,000 to fund the studies and the interpretation of the data collected therefrom. *Id.* USGS also consulted with the state agency about the project's design and, at the request of the state agency, conducted further studies on the environmental impact of the project on other areas. *Id.*

HUD was involved with the project because it provided advice regarding an application for a federal grant to be used for the project. Approximately $30,000 of the $500,000 grant was allocated to the water project. HUD recommended that "the scope of the activities proposed to be funded by the grant to those exempted from NEPA requirements in order to expedite the approval process." *Id.* In total, the two federal agencies provided approximately $1.3 million for the project. However, the federal funding constituted "less than two percent of the estimated total project cost of $80 million." *Id.* at 960.

The court concluded that "the federal funding contribution alone could not transform the entire Kohala Project into a 'major federal action.'" *Id.* The court then analyzed whether or not

United States District Court

For the Northern District of California

USGS and HUD had a sufficient "degree of decision-making power, authority or control over the Kohala Project needed to render it a major federal action." *Id.* Notwithstanding the fact that USGS played an advisory role in the planning of the project, the "final decision-making power remained at all times" with the state agency. Accordingly, the Ninth Circuit held that "USGS involvement was not sufficient to constitute 'major federal action.'" *Id.* at 961. The Ninth Circuit also held that HUD's "provision of advice and information" to the state agency "regarding its application for HUD's special purpose grant 'did not constitute discretionary involvement or control over' the entire Kohala Project" and, therefore, did not render the project a major federal action. *Id.*

The Ninth Circuit's opinion in *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (hereinafter "*Sierra Club*") also is instructive with respect to the question of whether an agency has the ability to influence a private actor's decision making process. In that case, the Bureau of Land Management ("BLM") entered into a reciprocal right-of-way agreement with a private company that allowed the company to use existing logging roads on BLM forest land and allowed the company to construct new roads over specified BLM forest lands, subject to certain conditions, to access the company's private property. *Id.* at 1505. BLM and the company entered into this agreement before NEPA was enacted. The agreement then was assigned to a new company, Seneca Sawmill Company ("Seneca"), on the condition that Seneca "comply with ... '[a]ll other applicable State and Federal environmental laws, regulations and standards.'" *Id.* at 1506 (bracket in original). If Seneca failed to do so, the BLM could "discontinue all construction or other operations under the permit upon written notice...." *Id.* (internal quotations and brackets omitted.) However, the court concluded that the assignment did not alter BLM's discretion under the original agreement, which limited its ability to influence construction to three specified conditions, none of which addressed effects on protected species. *Id.* at 1508 n.7 & 1510-11.

Following the assignment, Seneca sought to construct a new access road. BLM conducted an EA and noted that the construction might affect the spotted owl and its habitat. The biologist who prepared the EA recommended that BLM consult with the United States Fish

35

United States District Court

For the Northern District of California

and Wildlife Service, pursuant to the Endangered Species Act ("ESA").  Ultimately, however, BLM determined that the environmental requirements in the Seneca assignment did give it additional discretion beyond the three conditions outlined in the original agreement. Accordingly, BLM approved the construction without an ESA consultation, because it concluded that it could not exercise control over Seneca with respect to the protection of the spotted owl.  *Id.* at 1506-07.

The plaintiffs sought to halt construction of the access road and argued that BLM violated the ESA by failing to consult with the Fish and Wildlife Service, and that BLM violated NEPA because its EA was inadequate.  *Id.* at 1507.  The Ninth Circuit rejected both of plaintiffs' claims.  The court focused on the ESA claim and concluded that BLM did not violate the ESA because Seneca had a preexisting right to construct the access road and because, under the agreement, BLM did "not possess the ability to implement measures that inure to the benefit of the spotted owl."  *Id.* at 1508-09.

The court then found that resolution of the ESA claim largely "dictate[d] the resolution of the NEPA claim" and held that BLM did not violate NEPA.  *Id.* at 1512-13.  The court again noted that none of the three conditions that would have permitted BLM to halt or modify the project were related to protecting the spotted owl or its habitat.  *Id.* at 1512.  Therefore, the court held that "[t]he BLM's inability meaningfully to influence Seneca's right-of-way construction," in a manner that would benefit the spotted owl, "leads us to conclude that the procedural requirements of NEPA do not apply to this case."  *Id.* at 1513.

In contrast is the *Fish and Wildlife* case.  There, the plaintiffs filed suit to enjoin the United States Fish and Wildlife Service ("FWS") from proceeding with a study relating to Oregon's elk population, which the Oregon Department of Fish and Wildlife would conduct but which the FWS would fund, in part.  235 F. Supp. 2d at 1117.  The defendants asserted that NEPA was not implicated because FWS's involvement was not sufficient to federalize what was otherwise a state run project.  *Id.* at 1120.  Relying on *Ka Makani*, the district court concluded otherwise.  It first noted that it was undisputed that "federal monies ... account for seventy-five percent of the elk study budget," and stated that "[g]iven the overwhelming

percentage of federal dollars involved, and the fact that the amount itself, regardless of the percentage it represents is more than $3 million, the federal funding contribution alone is probably sufficient to 'federalize' the project." *Id.* at 1121. The court, however, also examined FWS's ability to control the project and found that while the decision to fund the project did not give rise to the requisite control and responsibility, FWS had the ability to control the project through its oversight function:

> The elk study is a project involving wildlife research and thus, the Secretary does not disburse funds under the [Wildlife Restoration Act] unless the study is being conducted in compliance with its plans and specifications. Monitoring to ensure compliance demonstrates the ability to control the manner in which the study is being conducted because if the study is not being conducted in compliance with the plan as proposed, the implication is that the FWS will no longer fund it.

*Id.* at 1121.

The lesson this Court draws from these cases is that where non-federal activity is involved, a court must look to whether an agency that provides financing to a project can influence or does possess actual power to control non-federal activity.[16] Therefore, the Court must consider carefully the nature of Defendants' involvement in these projects and particularly what conditions, if any, the agencies impose in connection with financing.[17]

---

[16] *See also United States v. Southern Florida Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994) ("The touchstone of major federal activity constitutes a federal agency's authority to influence non-federal activity."); *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988) ("The touchstone of major federal action ... is an agency's authority to influence significant nonfederal activity. This influence must be more than the power to give nonbinding advice to the nonfederal actor. ... Rather, the federal agency must possess actual power to control the nonfederal activity."), *overruled on other grounds, Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992).

[17] Plaintiffs also contend that each agencies own rules and procedures demonstrate that these projects qualify as "major federal actions." (Plaintiffs' Reply at 9-11.) For example, Plaintiffs note that OPIC defines a "major action," as any "contractual commitment by OPIC to provide assistance under an OPIC program involving at least $1 million of insured investment, loan guaranties or direct loans." (*See* OPIC A.R. Tab 2 at 00032).) That statement is qualified by the requirement that the applicant "has or will have sufficient control over the design and/or operation of the project to mitigate environmental concerns raised by OPIC." (*Id.*) Even if OPIC intended its definition of "major action" to be equated with a "major federal action" in NEPA parlance there is insufficient evidence in the record to show that the applicants for the projects identified in the SAC "have sufficient control over the design and/or operation of the project to mitigate environmental concerns," if any, that were raised by OPIC.

United States District Court

For the Northern District of California

1    In their moving papers, Plaintiffs make no effort to show Defendants have decision

2   making authority over the projects in question.  In their opposition to Defendants' cross-

3   motions, Plaintiffs argue that the Defendants admit in their annual reports that, without

4   Defendants' financing many of the projects would not have gone forward.  (*See* Ex-Im A.R. Tab

5   4 at 2; OPIC A.R. Tab 3 at 000053; Plaintiffs' Ex. 3.)  Plaintiffs also rely on the "Monitoring

6   and Compliance" provision of the OPIC Handbook, which provides that failure to comply with

7   conditions imposed in connection with financing can constitute a material default.  (*See* OPIC

8   A.R. Tab 2 at 000028.)  This evidence only reflects general statements by the Defendants and

9   does not address specific projects.  (*See also* Ex-Im A.R. Tab 2 at 3; OPIC A.R. Tab 2 at

10   000026-28; OPIC A.R. Tab 4 at 80.)

11    OPIC endeavors to establish that it does not have the requisite control and responsibility

12   by putting forth Mr. Himburg's declaration.  He states that "[t]here is no doubt that full

13   development of the oil fields at Doba in southern Chad would have happened without OPIC

14   insurance to this particular subcontractor, Pride – as the project was previously committed to by

15   the prime contractor and financed by the World Bank.  The only operational result of not having

16   OPIC's insurance may have been Pride's inability to undertake its commitments as a

17   subcontractor for Esso."  (Himburg Decl. ¶ 23.)  Mr. Himburg makes similar statements about

18   the Sakhalin and West Seno I Projects.  (Himburg Decl. ¶ 29 ("Based on the financial strength

19   of the project sponsors and the participation of other lenders and insurers, the Sakhalin II

20   project could have gone forward without the OPIC loan guaranty."), ¶ 37 (The "West Seno I

21   Project could have gone forward without OPIC because of the financial strength of Unocal and

22   Unocal's decades of experience in doing similar transactions in Indonesia.").)  However,

23   although Mr. Himburg may have knowledge of OPIC's operating procedures and operations, it

24   is not clear that he has the requisite knowledge or expertise to offer a conclusive opinion on

25   whether these projects would, in fact, have gone forward without OPIC's support.  Further, as to

26   Ex-Im projects generally, the Ex-Im Report states that "virtually all of the projects would have

27   gone forward even if Ex-Im Bank financing had not been forthcoming."  (Ex-Im A.R. Tab 2 at

28   34.)

1   //

2   //

3   //

4   //

5          Moreover, OPIC submitted portions of contracts relating to the Chad-Cameroon, West

6   Seno I and Sakhalin Projects.  (*See* OPIC Exs. 1GG-1NN.)[18]  The OPIC environmental

7   assessment for West Seno I and II, recommends that "UML [the operator of the project] *shall*

8   *conduct its operations in accordance with the following....*"  (OPIC Ex. II at 53 (emphasis

9   added.)  The recommendations do not follow, but the mandatory nature of the statement

10  supports Plaintiffs' position that OPIC exercised a level of control over the non-federal actors'

11  decision making process.  With respect to the Sakhalin and Chad-Cameroon Projects, OPIC

12  submitted similar evidence that shows it may have been able to influence non-federal actors.

13  (OPIC Exs. 1KK at 154 ("OPIC has required that discharge requirements for air emissions ...

14  meet both Russian and World Bank requirements.  Further OPIC will require that U.S. Federal

15  regulations be met for produced water and a revised monitoring plan be submitted prior to

16  drilling that will evaluate the application of other U.S. Federal water regulations to the

17  project."); 1LL at 87 ("[t]he Insured shall take, and shall cause the contractor to take, each of

18  the following actions, it being agreed that the failure in any material respect shall constitute a

19  default: (i) perform all project activities in compliance with the Oil and Gas (Onshore)

20  Guidelines as published in the World Bank Group's Pollution Prevention and Abatement

21  Handbook, dated July 1998 ..."); 1MM at 83-84 ("The contract of insurance will require that

22  Pride shall cause Pride Forasol to undertake the Project fully consistent with the International

23  Finance Corporation's 1998 Environmental Health and Safety Guidelines for Oil and Gas

24  (Onshore) and environmental, health and safety provisions contained or referenced in the

---

25

26  [18]      Exhibit 1GG is a chart that is excerpted from "the Board Paper for the West
    SEno Project."  (*See* OPIC Ex. 1 (Declaration of Connie Downs ¶ 37).)  This chart does
    contain any information about OPIC's level of control over the West Seno I Project.

27  Exhibits 1HH, and 1JJ are incomplete copies the contracts relating to OPIC financing for the
    West Seno I and Sakhalin Projects, which do not include what conditions, if any, were

28  imposed as part of the financing.  Thus, apart from placing the surrounding exhibits in
    context, these documents are not material to the resolution of these motions.

United States District Court

For the Northern District of California

Contract."); 1MM at 74 (OPIC environmental assessment for Chad Cameroon Project, which makes recommendations as to what conditions should be included in insurance contract).

With respect to Ex-Im, it is authorized by statute to "withhold financing from a project for environmental reasons or to approve financing after considering the environmental effects of a project." 12 U.S.C. § 635i-5(a)(2). Consistent with this statutory authority, Ms. O'Boyle states that "[a]s part of the engineering and environmental review for" the application for the Dezhou Project, "Ex-Im ... required the particulate emissions to be reduced to the Ex-Im ... guideline limit through greater efficiency." (O'Boyle Decl. ¶ 44.) This statement suggests that Ex-Im may have had the ability to exercise some influence over non-federal actors. As such, these facts support Plaintiffs' argument that Defendants can influence decision making by granting or withholding support for the projects.

Assuming that a recipient of OPIC or Ex-IM financing materially defaulted on a loan guaranty by failing to perform either the project within either agency's environmental guidelines, if the level of financing would not impact the project's operations or if the applicants could have found financing elsewhere, the Court cannot say the conditions imposed to receive the financing would give the Defendants sufficient control and responsibility to render those projects major federal action. In this respect, because none of the projects involved are financed primarily by Defendants, the Court concludes that the *Fish and Wildlife* case, and its conclusion regarding major federal action, is distinguishable, and the Court cannot find in favor of the Plaintiffs. The Court also finds that the information in the record is in conflict and is insufficient to conclusively resolve the issue of Defendants' ability, or lack thereof, to influence the decision making process.

Therefore, the Court finds that Plaintiffs have failed to show, as a matter of law, that any of the projects identified in the SAC qualify as major federal action. The Court also finds that Defendants have not shown, as a matter of law, that any of the projects identified in the SAC do

United States District Court

For the Northern District of California

1    *not* qualify as major federal action.  The parties' cross-motions are DENIED as to each of the

2    projects identified in the SAC.[19]

3                              **b.      Projects not identified in the SAC.**

4          In their SAC, Plaintiffs generally allege that "OPIC and Ex-Im have supported

5    numerous other fossil-fuel-fired power plants around the world."  (*Id.* ¶¶ 204-211 (alleging that

6    Ex-Im has supported 101 projects and that OPIC has supported 61 projects).)  In their motion,

7    Plaintiffs again assert, generally, that "between 1990 and 2001 Ex-Im approved 474 separate

8    transactions for fossil fuel projects, providing more than $25 billion in loans and financial

9    guarantees to energy projects world wide," and that "[s]ince 1999, Ex-Im has approved at least

10   45 additional transactions for fossil fuel projects ... providing another $6 billion in financial

11   assistance for oil and gas development projects and power plants."  (Plaintiffs' Mot. at 10.)

12   With respect to OPIC, Plaintiffs assert that "[b]etween 1990 and 2000, OPIC provided financial

13   support to at least 52 power projects," and that "[s]ince 2000, OPIC has approved at least 12

14   additional fossil fuel power projects."  (Plaintiffs' Mot. at 12.)

15         Defendants argue that Plaintiffs have failed to identify with sufficient specificity these

16   other projects.  Plaintiffs respond that the Administrative Record contains references to such

17   _____

18         [19]      Defendants urge the Court to find that the impacts of global warming on the
     domestic environment, alleged to be caused by the projects they support, are too remote and
19   speculative to be considered for purposes of NEPA.  (*See* OPIC Mot. at 36:13-42:9; Ex-Im
     Mot. at 24:17-30:4.)  However, it is undisputed that these projects do emit GHGs.  Further,
20   based on the statements in their climate change reports regarding the effects of GHGs on
     climate change, it would be difficult for the Court to conclude that Defendants have created a
21   genuine dispute that GHGs do not contribute to global warming.  (*See Assessing Our Actions*
     at 7 ("There is a strong and growing scientific consensus that these steady additions of GHGs
22   have tipped a delicate balance and begun to impact our climate and may be the dominant
     force driving recent warming trends."), 22 (acknowledging that GHGs become "very well
23   mixed in the atmosphere and have a global impact that is mostly independent of where they
     were emitted); Ex-Im Report at 4 ("GHG concentrations have indeed risen and that there is a
24   reasonable likelihood that the increased concentration of these gases will result in increased
     average global temperatures during the coming decades.").)  The question, however,
25   becomes whether Defendants are a "but for" cause of these GHG emissions.  *See, e.g., Public
     Citizen*, 541 U.S. at 770 (concluding that where an agency has limited authority over the
26   relevant action to prevent a certain effect, agency "cannot be considered a legally relevant
     'cause' of the effect).  Because the Court is unable to determine whether the alleged actions
27   would have gone forward without Defendants' participation and cannot determine whether
     Defendants could exercise control over the projects, the Court cannot determine whether
28   Defendants are a legally relevant cause of the alleged effects on the domestic environment.

United States District Court

For the Northern District of California

1  projects, citing to, *inter alia*, Ex-Im A.R. Tabs 24-28.  Ex-Im A.R. Tabs 24-27 are Engineering

2  Evaluations, which do not set forth any information about the total cost of a specific project or

3  the percentage of funding provided by Ex-Im.  Similarly, Ex-Im A.R. Tab 28 is a chart entitled

4  "CO2 Emissions for Projects Financed by Ex-Im Bank Fiscal Years 2000 thru 2003 (present)."

5  The last column of that chart sets forth the total amount of financing authorized by Ex-Im for 45

6  particular projects, but provides no information about what percentage of the total project costs

7  these figures represent.  For the reasons set forth in the preceding section, the Court cannot

8  determine whether these various projects would qualify as major federal actions based on that

9  evidence.  *See Ka Makani*, 295 F.3d at 960 ("consideration must be given to a 'great disparity in

10  the expenditures forecast for the state [and county] and federal portions of the *entire* program'")

11  (emphasis in original).

12  Accordingly, although Plaintiffs correctly note that there are a number of other projects

13  listed by name in the Defendants' Administrative Records, there is insufficient information

14  about what the total costs of these projects are and what level of control and responsibility, if

15  any, OPIC or Ex-Im have over these projects.  The Court therefore DENIES the motions to the

16  extent the parties move for summary judgment in their favor with respect to those projects listed

17  in the Administrative Record that are not identified in the SAC.

18  **4.      The Court Cannot Determine Whether The Actions Identified in the SAC Are Cumulative Actions Requiring A Single EIS.**

19

20  Plaintiffs also contend that Defendants must prepare a single environmental impact

21  statement under NEPA for the projects identified in the SAC.  CEQ regulations require that

22  "two or more agency actions must be discussed in the same impact statement where they are

23  'connected' or 'cumulative' actions."  *Klamath-Siskiyou Wildlands Center v. Bureau of Land

24  Management*, 387 F.3d 989, 999 (9th Cir. 2004) (citing 40 C.F.R. § 1508.25.)  Plaintiffs do not

25  contend the challenged actions are "connected."  Rather, they argue that the actions are

26  "cumulative."

27  Section 1508.25 defines cumulative actions, as "actions, which when viewed with other

28  proposed actions have cumulatively significant impacts and should therefore be discussed in the

1   same impact statement."  40 C.F.R. § 1508.25(a)(2).  A cumulative impact is defined as 'the

2   impact on the environment which results from the incremental impact of the action when added

3   to other past, present, and reasonably foreseeable future actions. ... Cumulative impacts can

4   result from individually minor but collectively significant actions taking place over a period of

5   time.'" *Great Basin*, 456 F.3d at 971 (quoting 40 C.F.R. § 1508.7.)

6          Because the Court cannot determine whether or not the individual projects identified in

7   the SAC qualify as major federal actions, the Court cannot determine whether any of these

8   actions would qualify as "cumulative actions" that would require a single EIS under NEPA.

9   The Court does note, however, that in general the Ninth Circuit has determined that a single EIS

10  addressing "cumulative actions" is required when there is either a geographical or temporal

11  nexus among the proposed actions or where there is some suggestion that an agency

12  intentionally divided a project into multiple actions.  *Compare Earth Island Inst. v. United*

13  *States Forest Serv.*, 351 F.3d 1291, 1304-06 (9th Cir. 2003) (concluding that single statement

14  was not required where boundary determination predated the agency's decision and timber sales

15  were not announced simultaneously and were to proceed on different timetables) *with Blue*

16  *Mountains*, 161 F.3d at 1215 (single EIS required and actions determined to be cumulative

17  where timber sales were located in same area, were part of a single project, and were announced

18  simultaneously).

19                      **5.    Plaintiffs Are Not Entitled to an Injunction Directing Defendants to
                               Prepare An EA or an EIS for Each and Every Fossil Fuel Project**
20                      **They May Approve In the Future.**

21         Plaintiffs also seek an injunction from this Court that would require the Defendants to

22  prepare an EA or an EIS for any future fossil-fuel related projects that they may approve in the

23  future.  An agency is required to prepare an environmental impact statement or an

24  environmental assessment only for those "major Federal actions significantly affecting the

25  quality of the human environment."  42 U.S.C. § 4332(c).  As is evident from the discussion in

26  the preceding section, the determination of whether a given project will qualify as a major

27  federal action is a fact intensive inquiry, especially given Plaintiffs' theory that Defendants

28  exercise control over the projects the support through their ability to grant, deny or withold

**United States District Court**
For the Northern District of California

1    financing during the course of a project.  Accordingly, the Court cannot find as a matter of law

2    that each and every fossil fuel related project that Ex-Im or OPIC may undertake in the future

3    will trigger NEPA's requirements.  Therefore, to the extent Plaintiffs seek prospective

4    injunctive relief and a declaration that all fossil-fuel related projects the Defendants finance are

5    subject to NEPA, their motion is DENIED, and Defendants' cross-motions are GRANTED IN

6    PART on this basis.

7    **IV.**    **CONCLUSION**

8            For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED.

9    Defendants' cross-motions are GRANTED IN PART AND DENIED IN PART.  The parties

10    are HEREBY ORDERED to appear for a case management conference on April 27, 2007 at

11    1:30 p.m.  The parties shall submit a joint case management statement setting forth their

12    respective positions on how this case shall proceed and whether any party intends to seek an

13    interlocutory appeal of this Order by April 20, 2007.

14            If any party wishes to participate in the case management conference by telephone, they

15    shall submit an administrative request to the Court by no later than April 20, 2007.

16            **IT IS SO ORDERED.**

17

18

19

20

21

22

23

24

25

26

27

28

1   Dated: March 30, 2007

2                                                       _____
                                                        JEFFREY S. WHITE
                                                        UNITED STATES DISTRICT JUDGE
3

4

5

6

7

8

9

10

**United States District Court**
For the Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28